**TEXAS ASSOCIATION OF LONG DISTANCE TELEPHONE COMPANIES (TEXALTEL), Appellant,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.**

No. 3–89–225–CV.

Court of Appeals of Texas, Austin.

Nov. 14, 1990.

Myra McDaniel, Katie Bond, Bickerstaff, Heath & Smiley, Austin, for appellant.

Jim Mattox, Atty. Gen., Steve Baron, W. Scott McCullough, Asst. Attys. Gen., R. Steven Davis, II, Baker & Botts, Austin, for appellee.

Before CARROLL, JONES and EARL W. SMITH,* JJ.

ON MOTION FOR REHEARING

JONES, Justice.

The opinion issued by this Court on September 19, 1990, is withdrawn, and the following is filed in lieu thereof.

_____

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See*

The Texas Association of Long Distance Telephone Companies ("TEXALTEL") appeals from a judgment of the district court affirming an order of the appellee, Public Utility Commission ("PUC"). The PUC's order increased the rates for services provided by AT & T Communications of the Southwest ("AT & T"), including wide area telecommunications service ("WATS"). We will affirm the judgment of the district court.

Docket No. 6095 was initiated in January 1985 in response to AT & T's application to increase its rates, including WATS rates, by $123.4 million. The application was amended on April 4, 1985, to request a rate increase of $139 million. Pursuant to § 43(d) of the Public Utilities Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c (Supp.1990), the PUC subsequently suspended AT & T's proposed rates. As a result of pending hearings, the suspension period was extended through October 23, 1985, and thereafter AT & T voluntarily extended the suspension period until March 2, 1986.

On February 7, 1986, the PUC ordered a rate increase totalling $55.1 million. As part of this rate increase, the PUC's order directed AT & T to increase overall WATS rates approximately 33 percent over then-existing rates. While recognizing that this rate increase would not be sufficient even to enable AT & T to recoup all of its costs associated with its WATS service, the PUC determined that, in order to avoid severe customer impact, no individual customer should receive a rate increase of more than 145 percent. The PUC ordered AT & T to file revised tariffs within twenty days, to be effective twenty days after filing or sooner upon approval by the PUC staff.

On February 10, 1986, AT & T filed proposed tariffs, including a WATS tariff. The proposed WATS tariff was rejected by the PUC's Hearings Division on March 1. On March 5, AT & T filed another proposed

Tex.Gov't Code Ann. § 74.003 (1988).

WATS tariff. On March 11, the PUC issued an order ruling on motions for rehearing and amending its February 7 order. Among other things, the March 11 order stated that AT & T could apply any WATS tariff approved by the staff on or after March 27 and prior to April 27 to service provided on or after April 1. On March 25, the staff of the Hearings Division rejected AT & T's second proposed WATS tariff, whereupon AT & T filed with the PUC an emergency petition seeking approval of the proposed WATS tariff that had been filed on March 5; the petition also requested the PUC to consider motions for rehearing filed in response to the March 11 order. On April 9, the PUC met to consider AT & T's petition. That same day, following the hearing, the PUC issued an order which, in addition to granting a rehearing on the accuracy of certain numbers on which the level of AT & T's new rates had been based in the February 7 order, also directed that AT & T's WATS tariff be approved effective April 1, 1986.

The PUC later issued yet another order on July 28 in which it found that the February 7 order contained a $16,477 overstatement, but that the error had no effect on the rate design or the approved tariffs. The February 7 order became appealable on November 7, 1986, when all motions for rehearing were overruled.

TEXALTEL and numerous other parties to the PUC proceedings, including AT & T and the State Purchasing and General Services Commission ("SPGSC"), filed separate suits in the district court of Travis County seeking judicial review of the PUC's action. The relevant petitions named only the PUC as defendant. All such suits were eventually consolidated into a single cause. Shortly before the scheduled trial, all parties except TEXALTEL settled with the PUC. TEXALTEL's claim then proceeded to trial, following which the trial court rendered a final judgment ordering that (1) pursuant to the parties' settlement agreement, all claims other than those of TEXALTEL be dismissed; and (2) TEXALTEL take nothing.

## MOTION TO STRIKE BRIEFS

TEXALTEL has filed a motion in this Court to strike the briefs of AT & T and the SPGSC, which those entities purported to file as appellees. Following the dismissal of their claims in the trial court, neither AT & T nor the SPGSC retained any pleaded claim or interest contrary to TEXALTEL vis-a-vis TEXALTEL's action against the PUC. In order to have created and protected their status as parties adverse to TEXALTEL, AT & T and the SPGSC should have asserted their contrary claims or interest by way of a plea in intervention in TEXALTEL's suit before consolidation of the actions, or by repleading after consolidation. Having failed to do either, the trial court's dismissal of their claims against the PUC left them as strangers to the consolidated cause. Accordingly, in this appeal they were not entitled to file briefs as appellees. We therefore grant TEXALTEL's motion to strike. However, pursuant to Rule 20, Tex.R. App.P., we have received and fully considered both briefs as *amicus curiae. Cf. Houston Chronicle Pub. Co. v. City of Houston,* 531 S.W.2d 177, 182 (Tex.Civ. App.1975), writ ref'd n.r.e., 536 S.W.2d 559 (Tex.1976).

TEXALTEL brings three points of error. In its first point of error TEXALTEL contends that the trial court erred in affirming the final order of the PUC because the PUC exceeded its statutory authority in making the effective date of the new WATS tariffs (April 1, 1986) earlier than the date the order was final and appealable (November 7, 1986). Alternatively, in its second point of error, TEXALTEL contends that the PUC exceeded its statutory authority in making the effective date of the WATS tariffs earlier than the date the tariffs were approved (April 9, 1986). Finally, in its third point of error, TEXALTEL contends that one of the PUC's findings is not supported by the record.

## JURISDICTION

We must first address the PUC's assertion that TEXALTEL did not properly preserve the first two issues for our re-

view. The Administrative Procedure & Texas Register Act ("APTRA") provides that, except in the case of emergency orders issued by an agency, "a motion for rehearing is a prerequisite to an appeal." Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 16(e) (Supp.1990). This prerequisite is jurisdictional and cannot be waived by actions of the parties. *Lindsay v. Sterling*, 690 S.W.2d 560, 563 (Tex.1985). APTRA has been construed to require that a motion for rehearing be "sufficiently definite to apprise the regulatory agency of the error claimed and to allow the agency opportunity to correct the error or to prepare to defend it." *Suburban Util. Corp. v. PUC*, 652 S.W.2d 358, 365 (Tex.1983); *see also Burke v. Central Educ. Agency*, 725 S.W.2d 393, 397 (Tex.App.1987, writ ref'd n.r.e.).

In its motion for rehearing, TEXALTEL asserted that the PUC's action "setting rates retroactively is unjust and unreasonable in violation of PURA § 38, is in excess of the PUC's authority, and constitutes an abuse of discretion and arbitrary and capricious action." We conclude that the motion for rehearing was sufficiently definite to apprise the PUC of TEXALTEL's claimed error: that the PUC had exceeded its statutory authority by setting rates retroactively. We do not consider the mo-

tion's reference to PURA § 38 instead of § 43 to be so misleading as to prevent the PUC from deciding to change—or from preparing to defend—its action. Therefore, the motion was sufficient to give the district court and this Court jurisdiction to consider TEXALTEL's first two points of error.

### RETROACTIVE RATEMAKING

1. *General standards.*

TEXALTEL in its first two points of error argues that the PUC engaged in retroactive ratemaking.[1] TEXALTEL's argument seems to imply that a regulatory agency may never set a retroactive effective date for a rate change. That simply is not the law. *See Railroad Comm'n v. Lone Star Gas Co.*, 656 S.W.2d 421, 425–27 (Tex.1983); *Southwestern Bell Tel. Co. v. PUC*, 615 S.W.2d 947 (Tex.Civ.App.), writ ref'd n.r.e., 622 S.W.2d 82 (Tex.1981).

In general, when an administrative agency seeks to make a utility rate effective retroactively, two questions must be addressed: (1) whether the legislature intended for the statute conferring ratemaking power to permit the agency to amend or establish rates with retroactive effect; and (2) whether such action is per-

1. For a better understanding of the discussion under TEXALTEL's first two points of error, we will briefly summarize the statutory ratemaking process applicable to this case. An existing utility that desires a change in the rate that it is allowed to charge may do so by filing a statement of intent with the Commission at least 35 days prior to the proposed effective date of the change; the statement of intent includes such things as a proposed revision of tariffs and schedules (the part of the proposed rate that governs the relationship between the utility and its customers), and a statement specifying each proposed change and the effect of such a change. PURA § 43(a).

If the proposed change does not constitute a major change and if no one complains, the proposed change takes effect on the proposed effective date, or sooner in some cases. PURA § 43(b). However, if any affected person complains, if the proposed change constitutes a major change, or if the Commission so desires, the Commission can hold hearings to determine the propriety of the change. PURA § 43(c).

Pending a hearing and a decision, the Commission may suspend the effectiveness of the pro-

posed rate for 150 days beyond the proposed effective date of the change, and this suspension period itself will be extended two days for each day of actual hearing on the merits of the case that exceeds 15 days. If the Commission does not make a "final determination" of the rates prior to the end of the suspension period, the proposed rates shall be "deemed to have been approved" by the Commission. PURA § 43(d). If the 150–day suspension period is extended, and the Commission has failed to make its final determination within 150 days from the proposed effective date of the change, the utility may put a changed interim rate into effect to cover the remainder of the suspension period by filing a bond with the Commission. PURA § 43(e).

Finally, if the Commission determines that the proposed rates are impermissible, the Commission shall determine the "level of rates to be charged or applied" by the utility and "shall fix the same by order to be served on the utility; these rates are thereafter to be observed until changed." PURA § 43(f).

mitted constitutionally. *Southwestern Bell*, 615 S.W.2d at 953. The basic premise underlying the prohibition against retroactive ratemaking is that the setting of utility rates is a legislative function, even if carried out by an administrative agency; therefore, utility rates, like any other legislation, generally can have only prospective application and cannot be used to recoup losses or gains incurred under prior legal rates. Tex.Const.Ann. art. I, § 16 (1984); *see Railroad Comm'n v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956).

■ Although article I, section 16 of the Texas Constitution expressly forbids retroactive legislation, it has been held not to invalidate all retroactive laws; unless *vested rights* are impaired, a statute (or rate) is not constitutionally infirm even though it operates retrospectively. *McCain v. Yost*, 155 Tex. 174, 284 S.W.2d 898 (1955); *see also Amarillo Gas Co. v. City of Amarillo*, 208 S.W. 239 (Tex.Civ.App.1919, no writ) (prohibiting a retroactive change in utility rates affecting "the substantial rights and obligations of" the implied contract between a utility and its customers).

■ This Court has held that "no person can have a vested right in any rate other than the last legal or official rate[2] promulgated by the PUC." *Southwestern Bell*, 615 S.W.2d at 957. This holding is in accord with the legal theory that rates promulgated by the PUC are presumed to be valid rates. *Accord New England Tel. & Tel. Co. v. Public Util. Comm'n.*, 116 R.I. 356, 358 A.2d 1, 21–23 (1976); *Montana Horse Prod. Co. v. Great N. Ry. Co.*, 91 Mont. 194, 7 P.2d 919 (1932).

■ Although one can have a vested right in an existing legal or official rate, that rate will not necessarily retain its protected status. A legal rate is said to be presumed valid, but such a presumption can be overcome. Thus, when a regulatory agency's jurisdiction attaches to a rate (e.g., when an existing rate's validity is formally called into question), the presumption of validity vanishes, and no one can continue to claim to have a vested right in the rate. *See Lone Star Gas*, 656 S.W.2d at 426; *Texas Water Rights Comm'n v. City of Dallas*, 591 S.W.2d 609, 614 (Tex. Civ.App.1979, writ ref'd n.r.e.). The constitutional prohibition against retroactive ratemaking therefore does not apply when a regulatory agency establishes an effective date that is later than the date its jurisdiction attached. *Id.*

Turning now to statutory provisions that operate to prohibit retroactive ratemaking, this proceeding was initiated under PURA § 43. Section 43(f) states:

> If, after hearing, the Regulatory Authority finds the rates to be unreasonable or in any way in violation of any provision of law, the Regulatory Authority shall determine the level of rates to be charged or applied by the utility for the service in question and shall fix the same by order to be served upon the utility; these rates are *thereafter* to be observed until changed, as provided by this Act.

(Emphasis added.) This Court has interpreted PURA § 43(f) to prohibit the PUC from setting the effective date of a new rate to a date earlier than the PUC's "order." *PUC v. General Tel. Co.*, 777 S.W.2d 827, 829–30 (Tex.App.1989, writ dism'd); *Southwestern Bell*, 615 S.W.2d at 955. This interpretation is based on the United States Supreme Court's interpretation of a similarly worded Ohio statute. *See Public Util. Comm'n v. United Fuel Gas Co.*, 317 U.S. 456, 464, 63 S.Ct. 369, 374, 87 L.Ed. 396 (1943).

### 2. *"Rates" as used in PURA § 43(f).*

■ In its second point of error, TEXALTEL argues that the "order" that is critical for determining when a new rate can become effective is the order fixing the "level

---

2. Apparently, in Texas no one can have a vested right in a utility rate until the rate is administratively and judicially final. *Southwestern Bell v. PUC*, 615 S.W.2d at 957 (holding that the Commission, on remand, can set the effective date of a rate to be the effective date of the original Commission activity); *but see New England Tel. & Tel. Co. v. Public Util. Comm'n*, 116 R.I. 356, 358 A.2d 1, 22 (1976) ("[E]stablished rates are presumed to be valid while they are in force and ... neither the commission nor the court has the power to alter such rules retroactively.")

of rates," and that there can be no order fixing the level of rates until the PUC finalizes all action with regard to the new rates by approving new tariffs. TEXALTEL argues that an order merely fixing the level of *revenues* the utility is entitled to recover and setting out the general rate structure, as was done in the PUC's February 7, 1986, order, is not an order fixing the "level of rates." Therefore, TEXALTEL contends that PURA § 43(f) prohibited the PUC from setting the effective date of the new rate to a date earlier than April 9, 1986, when the tariffs were approved, and that by setting the effective date as April 1 the PUC engaged in statutorily prohibited retroactive ratemaking.

TEXALTEL bases its argument on the PURA definition of "rate" as "every compensation, tariff, charge, fare, toll, rental, and classification, or any of them demanded, observed, charged or collected...." PURA § 3(d). TEXALTEL argues that this definition necessitates the conclusion that an order fixing the level of revenues but not approving a tariff cannot be an order "fixing the level of rates."

The PUC responds that under the Texas Supreme Court's holding in *Lone Star Gas*, 656 S.W.2d 421, it had the discretion to set the effective date to any date after it obtained jurisdiction over the rate. However, we need not address this issue because we conclude that determining the "level of rates" as used in PURA § 43(f) does not include approval of specific tariffs. *Cf. Texas Alarm & Signal Ass'n v. PUC*, 603 S.W.2d 766, 771 n. 6 (Tex.1980) (use of "rate" in a now-repealed version of PURA § 40 refers to overall revenues and not to rate structure).

■■■■■ Generally, the determination of what rates a utility may charge involves three steps: first, the amount of revenues that the utility is entitled to receive from all services must be determined; second, the sources of these revenues (i.e., the level of revenue each service will provide) must be determined; and third, the specific charges to individual consumers or classes of consumers for the specific services must be set. When a requested rate change has been denied, but the regulatory agency determines that the existing rates are unreasonable, the burden of determining the proper revised rate falls on the agency. Usually, once the regulatory agency has determined a utility's revenue requirements (step one) and the rate structure (step two), the agency will direct the utility to file new tariffs, leaving the determination of the specific tariff or rate schedule (step three) for the utility, subject to approval by the agency. *See* Priest, *Principles of Public Utility Regulation* 343 (1969); Welch, *Cases and Text on Public Utilities Regulation* 492–93 (1961). The proposal of tariff rates is left to the utility because, in general, the utility is thought to know more about the proper criteria than either agency staff or opposition experts and, therefore, is better able to allocate burdens between classes of consumers. *Id.*

■■■■ This is not to suggest that an agency's authority over rate-fixing stops at the point of determining the company's overall revenue requirements. On the contrary, the PUC is expressly given the duty of insuring that rates are just and reasonable and that no class of consumers receives unreasonably preferential, prejudicial, or discriminatory treatment. PURA § 38. The fulfillment of this duty requires the PUC to review submitted tariffs and, in addition, authorizes the PUC to direct the utility, in filing tariffs, to allocate burdens between classes of consumers in a manner prescribed by the agency.

■■■■ That does not mean, however, that the "order" fixing the "level of rates" required by PURA § 43(f) necessarily contemplates approval of tariffs before such rates may become effective. Section 43 of PURA establishes procedures for effectuating an increase in rates *requested by the utility*. The determinative order in response to such a request is, logically, the order setting the level of revenues; it is that order that determines whether the utility's request is granted or denied. Hence, we conclude that by directing the PUC to fix the level of rates, PURA § 43(f) does not direct the PUC to design or approve

tariffs. Rather, section 43(f) directs the PUC to determine, by order, the utility's overall revenues and, if deemed appropriate, the general rate design. Therefore, PURA § 43(f) did not prohibit the PUC from setting the effective date of a new rate at least as far back as the date of such an order. Because the effective date established by the PUC in the present case was *after* the date of the order determining the level of revenues, the PUC's action did not violate PURA § 43(f) and did not constitute retroactive ratemaking.

■■■■■ Moreover, the PUC must have some discretion in determining when an order constitutes an order fixing the level of rates. *See PUC v. Pedernales Elec. Coop., Inc.,* 678 S.W.2d 214, 222 (Tex.App. 1984, writ ref'd n.r.e.) ("The statutory scheme for the determination of utility rates is complex; the subject matter is highly technical and dependent on agency discretion in various matters."). The contemporaneous construction of a statute by the administrative agency charged with its enforcement is said to be entitled to "great weight," so long as the construction is reasonable and does not contradict the "plain language" of the statute; this is particularly true when the statute because of its complexity is ambiguous. *See Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944); *Southwestern Bell Tel. Co. v. PUC,* 745 S.W.2d 918, 923 (Tex.App.1988, writ denied); *PUC v. Texland Elec. Co.,* 701 S.W.2d 261, 268 (Tex.App.1985, writ ref'd n.r.e.); *see also* Tex.Gov't Code Ann. § 311.023(6) (1988).

In the present case, the PUC obviously considered that both the February 7 order and the March 11 order constituted orders fixing the level of rates. The terms of both orders indicate that the PUC anticipated that no further orders of the PUC would be necessary to implement the new rates; both orders directed AT & T to file new tariffs "revised in accordance with the rates and guidelines set out" in the orders, and directed the PUC staff to review the new tariffs to see that they were in accordance with the orders. The February 7 order provided that the tariffs would become effective on the earlier of twenty days after filing or when they were approved by the staff; the March 11 order provided that the tariffs would become effective on April 1 if they were approved by the staff on or before April 26, 1986. Neither order required or even contemplated the issuance of a subsequent order to implement the new tariffs. That the PUC did in fact issue a formal order (the April 9 order) approving the tariffs was mere happenstance, necessitated by the express rejection of the tariffs by the Hearings Division staff. Thus, it is clear that the PUC considered both the February 7 and March 11 orders to be orders fixing the level of rates, as that phrase is used in PURA § 43(f). The PUC's determination on that issue is persuasive.

■■■■■ TEXALTEL also argues that allowing the PUC to set the effective date of the new rates to a date prior to the approval of tariffs is unfair to consumers because it deprives them of the opportunity to make alternative plans. However, because we have decided that PURA § 43(f) does not prohibit the PUC from setting the effective date to a date prior to the approval of the tariffs, this alleged unfairness is not relevant to whether the PUC exceeded its statutory authority. Rather, any unfairness resulting from the setting of an effective date is relevant only to the consideration of whether the PUC abused its discretion; within the confines of its discretion, the proper balance between competing concerns in setting the effective date of a changed rate must be determined by the PUC. *See Lone Star Gas,* 656 S.W.2d at 425–26. TEXALTEL does not bring a point of error complaining that the PUC abused its discretion. Therefore, that issue is not before us. TEXALTEL's second point of error is overruled.

3. *"Order" as used in PURA § 43(f).*

■■■■■ In its first point of error, TEXALTEL argues that the term "order," as used in PURA § 43(f), means a final and appealable order, and therefore the PUC erred in setting the effective date of the tariffs before the contested case became

appealable. As set forth in its brief, TEX-ALTEL's argument is as follows:

> By requiring the PUC to fix rates "by order," by defining "order" as a "final disposition in a matter," and by requiring that rates be observed "after" the "final disposition in a matter," the Legislature clearly intended the rates be fixed prospectively from the PUC's *final and appealable* order.

(Emphasis added.) Under TEXALTEL's argument, since there was no final and appealable order until all motions for rehearing were overruled on November 7, 1986, the new rates could not be made effective prior to that date.[3]

 TEXALTEL's argument that the term "order," as used in PURA, means a final and appealable order is based on the definition of "order" set out in PURA § 3(p):

> "Order" means the whole or a part of the final disposition, whether affirmative, negative, injunctive, or declaratory in form, of the regulatory authority in a matter other than rulemaking, but including issuance of certificates of convenience and necessity and ratesetting.

TEXALTEL's reading of the definition of "order" is too narrow. An "order" under PURA is "the whole *or a part of* the final disposition." (Emphasis added.) This definition does not even require that an order resolve all issues (i.e., be a final order), much less that it be an *appealable* order. The PURA definition of order would apparently include even an interlocutory order

(e.g., a temporary rate order). Certainly, an order of the PUC fixing the level of revenues and establishing rate design criteria, as the February 7, 1986, order did, is "a part of the final disposition" and, therefore, is an "order" within the foregoing definition.

Furthermore, the structure of PURA § 43 does not support such a narrow reading of "order." One of the goals of PURA § 43 is the timely implementation of revised rates. During the suspension period, the statute provides for temporary rates (§ 43(d)) and bonded rates (§ 43(e)) to protect the utility against delays in the administrative process—"regulatory lag." However, the statute does not provide for interim rates after the suspension period ends. Rather, the utility's proposed rates are "deemed approved" in such circumstances. PURA § 43(d).

 The foregoing leads to the conclusion that the legislature intended for revised rates to be made effective before the order fixing the level of rates has become administratively final. If TEXALTEL's position were correct, the PUC would have to produce a final *and appealable* order during the suspension period in order to avoid the complication and potential injustice to consumers of having the utility's proposed rates deemed approved. To produce such an order during the suspension period, the PUC would be forced to reach its initial rate determination with unreasonable haste, limiting the amount of consideration given to the issues and to motions for rehearing, and increasing the likelihood of

---

**3.** We read TEXALTEL's point of error as raising a retroactive date issue (whether the PUC was precluded by PURA from setting the effective date to a date before the order became administratively final) and not an implementation issue (whether the PUC was precluded from implementing a non-administratively final order).

There is a question whether an administrative agency may, under APTRA, implement an order before the order becomes administratively final. That is, may an agency implement an order that the agency still has the power to change?

There is some authority tending to support the view that APTRA, in general, precludes the implementation of an order that is not administratively final. APTRA directly implies that an agency can implement an order immediately on issuance (i.e., *before* it is administratively final)

only if the agency finds that "an imminent peril to the public health, safety, or welfare requires immediate effect of a final decision order." APTRA § 16(c); *see also Consumers Water, Inc. v. PUC,* 741 S.W.2d 348 (Tex.1987) (Commission amended order to include finding of imminent peril in order to allow immediate implementation of the order); *Sproles Motor Freight Lines v. Smith,* 130 S.W.2d 1087 (Tex.Civ.App.1939, writ ref'd).

However, we need not address this issue because we conclude that PURA § 43(f) authorizes the immediate implementation of new rates. Therefore, to the extent that APTRA precludes the implementation of a non-administratively final order, it is inconsistent with PURA, and the provisions of PURA apply. PURA § 4.

an erroneous decision. Certainly this is not what the legislature intended.

We conclude, therefore, that the use of the word "order" in PURA § 43(f) does not prohibit the PUC from setting the effective date of a revised rate to a date before the order becomes administratively final.[4] TEXALTEL's second point of error is overruled.

### 145% INCREASE LIMITATION

■ In its third point of error, TEXALTEL contends that the PUC erred in authorizing AT & T to increase WATS rates to certain customers by 145% because "there is no evidence in the record to support a 145% increase and therefore said increase is in excess of the PUC's authority and constitutes arbitrary and capricious action." TEXALTEL makes two discernible arguments under this point of error: (1) that there is no evidence to support Finding of Fact No. 136, and therefore the finding is not supported by substantial evidence; and (2) that the rates set by the PUC are not "just and reasonable," and that this Court independently can determine that the PUC has ordered an unreasonably high rate increase.

Finding of Fact No. 136 in the PUC's February 7, 1986, order states:

To avoid severe customer impact, the additional WATS revenues should be obtained by requiring no customer to receive a rate increase of more than 145 percent.

The thrust of TEXALTEL's argument is that there is no evidence—and therefore no substantial evidence—to support the PUC's conclusion that a 145% increase would avoid severe customer impact.

■ The PUC is given broad discretion to design a utility's rate structure. *PUC v. AT & T Communications of the South-*

west, 777 S.W.2d 363, 366 (Tex.1989); *Texas Alarm & Signal,* 603 S.W.2d at 772; *Texland,* 701 S.W.2d at 267. The PUC is given this discretion, in part, because a rate structure "is a complex problem that involves many factors" that the PUC should consider when designing the rate structure. *Texas Alarm & Signal,* 603 S.W.2d at 772. One of these factors unquestionably must be the public interest, including the impact that large rate increases would have on the utility's customers ("rate-shock"). PURA §§ 2, 18(a). Here, the PUC expressly stated that the design of the rate structure was based on two primary considerations: (1) recovery of revenues proportionate to the costs of providing the service, and (2) customer impact.[5]

■ The balance struck between these two primary considerations is a fundamental policy choice delegated to the agency. *AT & T Communications,* 777 S.W.2d at 366 ("As long as the commission addresses the rate considerations set by [PURA], the particular factors and the weight to be given those factors are within the discretion of the commission."). The agency could choose to implement such a policy choice through APTRA's formal rulemaking procedure. However, in balancing potentially competing policy considerations, the PUC can, under certain conditions, choose to implement its policy choice on an *ad hoc* basis. *See Southwestern Bell,* 745 S.W.2d at 926; *Madden v. Texas Bd. of Chiropractic Examiners,* 663 S.W.2d 622, 626 (Tex.App.1983, writ ref'd n.r.e.); *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794 (Tex.App.1982, writ ref'd n.r.e.); *see also* Beal, *Ad Hoc Rulemaking: Texas Style,* 41 Baylor L.Rev. 101 (1989). An *ad hoc* "rule" is an agency statement that interprets, implements, or prescribes agency law or policy. Beal, *supra* at 105 n. 22.

---

4. We do not undertake to decide whether the PUC has the authority to require a utility to refund the difference between, on the one hand, rates initially fixed by the PUC but later reduced on motion for rehearing and, on the other hand, the rates as finally approved.

5. Initially, we note that as to the first consideration—recovery of costs—the record amply sup-

ports the PUC's decision to raise rates for some WATS customers by 145%, and TEXALTEL apparently does not challenge this part of the finding. Rather, the gravamen of TEXALTEL'S point of error is that there is no evidence to support the PUC's conclusion that a 145% increase would not cause severe customer impact.

■ Here, the PUC's determination that a 145% increase in rates would not cause severe customer impact can be viewed as the implementation of a policy choice using an *ad hoc* method. As such, the relevant inquiry on judicial review is not whether the agency's policy choice is supported by substantial evidence, but whether the choice was arbitrary or capricious. *Southwestern Bell*, 745 S.W.2d at 926; *Madden*, 663 S.W.2d at 626 n. 2; *see also Bullock v. Hewlett–Packard Co.*, 628 S.W.2d 754 (Tex.1982). Thus, it is immaterial whether the record contains direct evidence that a 145% increase would not cause severe customer impact.

■ However, even assuming *arguendo* that this finding must have evidentiary support in the record,[6] we conclude that there is sufficient evidence to support the PUC's conclusion that a 145% increase would not cause undue rate-shock. As part of the hearing process, the PUC staff reviewed AT & T's proposed increase and presented its own rate design recommendations. The staff (through the testimony of Don Price) concluded that AT & T's proposed WATS rates, which would have increased rates by 245% for high volume users, *would* cause undue customer impact. Instead, the staff recommended that WATS rates as a whole be increased by 42%, increasing rates for high volume users by approximately 150%. There was direct testimony that the staff's recommended structure was designed to avoid severe customer impact.

This evidence is sufficient to provide the PUC with a reasonable basis for concluding that a 145% increase would not, in this instance, cause unacceptable customer impact; thus, the record contains sufficient evidence to support Finding of Fact No. 136. *See Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex.1984); *Railroad Comm'n v. Entex, Inc.*, 599 S.W.2d 292,

299 (Tex.1980); *see also* Powers, *Agency Adjudications* 162–63 (1990).

■ TEXALTEL also argues that this Court can independently evaluate the PUC's rate increase to see if it is "just and reasonable." In support of its argument, TEXALTEL cites us to *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526 (Tex. 1975), in which the Texas Supreme Court stated that the "determination of whether rates fixed by the utility are unreasonably high is a judicial function" and held that the district court could declare the rates to be invalid. *Id.* at 529–31; *see also Denison v. Municipal Gas Co.*, 117 Tex. 291, 3 S.W.2d 794 (1928). However, *Southwestern Bell* was decided before PURA was enacted. At that time, a telephone company could prescribe and apply its own rates without the necessity of obtaining prior approval by a regulatory agency; therefore, the court's holding was necessary to allow *any* review of a utility's rates. The court also stated that even if a regulatory authority prescribed the rates, courts could review the reasonableness of the rates because the determination would remain a "judicial function." Regardless of the accuracy of that statement, PURA § 38 now gives the PUC the power to determine whether rates are "just and reasonable." *Texas Alarm & Signal*, 603 S.W.2d at 772. Thus, that function has been delegated to the PUC, and the courts are limited to reviewing its determinations under the standards set out in APTRA. *See Entex, Inc.*, 599 S.W.2d at 298.

■ In reviewing the decision of an administrative agency, a reviewing court must distinguish between the agency's determination of questions of law and its determination of questions of fact. APTRA section 19(e) provides six possible grounds for invalidating agency action, all of which pertain to questions of law. The determination of whether rates are just and reasonable is a question of fact for the agency to decide. *See Entex, Inc.*, 599

---

**6.** *See Railroad Comm'n v. Lone Star Gas Co.*, 611 S.W.2d 908, 911 (Tex.Civ.App.1981, writ ref'd n.r.e.) ("A valid exercise of agency expertise, like other agency action, must find ultimate support upon evidence taken at the hearing or upon facts judicially noticed by the hearings officer in the record of such hearing.").

S.W.2d at 298. APTRA does not allow a reviewing court to substitute its judgment for that of the agency as to questions of fact. *Charter Medical,* 665 S.W.2d at 452. Therefore, we conclude that we are precluded from independently assessing whether the rates in issue here are just and reasonable. TEXALTEL's third point of error is overruled.

The judgment of the district court is affirmed.