**TXU ELECTRIC COMPANY,
et al., Appellants,**

v.

**PUBLIC UTILITY COMMISSION
OF TEXAS, et al., Appellees.**

No. 00–0936.

Supreme Court of Texas.

Argued Jan. 31, 2001.

Decided June 6, 2001.

Rehearing Overruled Aug. 30, 2001.

21.  *Id.* at 346.

22.  *Id.*

23.  *Id.* (quoting *State Bd. of Ins. v. Betts,* 158 Tex. 612, 315 S.W.2d 279, 281 (1958)).

Roy Q. Minton, Minton Burton Foster & Collins, Robert J. Hearon, Jr., Mary A. Keeney, Graves Dougherty Hearon & Moody, Austin, Robert A. Wooldridge, Robert M. Fillmore, Howard V. Fisher, Worsham Forsythe Wooldridge, Dallas, for Appellant.

Thomas K. Anson, Sheinfeld Maley & Kay, Geoffrey M. Gay, Lloyd Gosselink Blevins Rochelle, Austin, Alan W. Harris, Dallas, Marianne Carroll, David B. Gross, Carroll & Gross, Andrew Kever, Bickerstaff Heath Smiley Pollan Kever & McDaniel, Mark C. Davis, Brickfield Burchette & Ritts, James K. Rourke, Thomas Lane Brocato, Suzi Ray McClellan, Office of Public Utility Counsel, Steven Baron, Office of Attorney General of Texas, John Cornyn, Attorney General of the State of Texas, Jeffrey S. Boyd, Karen Watson Kornell, Douglas Fraser, Bryan L. Baker, Office of the Attorney General, Jonathan Day, Lino Mendiola, Mayor Day Caldwell & Keeton, Diane Barlow–Sparkman, Mark W. Smith, J. Kay Trostle, Elizabeth H. Drews, James G. Boyle, Law Office of Jim Boyle, Austin, for Appellee.

PER CURIAM.

In 1999, the Legislature amended the Public Utility Regulatory Act (PURA) to usher in deregulation of retail electric utility rates in Texas.[1] As part of that plan, the Legislature concluded that, subject to certain restrictions, an existing utility like TXU Electric Company may recover amounts that the PURA defines as "regulatory assets" by using securitization financing. Securitization is accomplished through a financing order issued by the Commission that authorizes a utility to issue transition bonds. The transition bonds are repaid or secured by transition charges to ratepayers in a utility's service area. TXU requested the Commission to issue a financing order securitizing certain of its regulatory assets. The Commission authorized securitization of some but not all of those assets. A district court reversed the Commission's order in part and remanded the case for further proceedings. TXU and others bring this direct appeal to our Court.[2]

We hold that: 1) in order to ensure that securitization provides tangible and quantifiable benefits to ratepayers greater than would have been achieved absent the issuance of transition bonds,[3] the Commission may apply a present value test in addition to the present value and revenue requirement tests expressly set forth in sections 39.301 and 39.303(a) of the PURA; 2) in applying an additional present value test, the Commission should assume that recovery of regulatory assets and stranded costs absent securitization would occur in substantially less than forty years; 3) the Commission must consider regulatory assets that a utility seeks to securitize in the aggregate to determine whether those assets meet the requirements for securitization and cannot categorically exclude certain types of regulatory assets from securitization; 4) section 39.253 permits the Commission to apply the rate design methodology established in a utility's last rate design case to the data in that rate case rather than to more current data, in order to establish demand allocation factors that determine how transition charges are to be allocated among classes of customers; 5) the Commission is authorized by section 39.307 to adopt a non-standard true-up provision that reallocates transition charges among classes of customers in a manner that differs from the allocation procedures set forth in section 39.253; 6) none of the other issues regarding allocation of transition costs among classes of customers has

---

1. Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543.

2. TEX. UTIL.CODE § 39.303(f) (providing that review of financing orders under the PURA are to be directly appealed from the district court to this Court).

3. All statutory references are to the Texas Utilities Code, unless otherwise indicated.

merit; and 7) certain findings of fact and conclusions of law by the Commission are advisory. Accordingly, we affirm the judgment of the district court in part, reverse it in part, and remand this case to the Commission for further proceedings. Justice Owen's concurring opinion is the opinion of the Court with respect to the issues that it addresses, and Justice Hecht's concurring opinion is the opinion of the Court with respect to the issues that it addresses.

Justice OWEN filed a concurring opinion, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON joined.

Justice HECHT filed a concurring opinion, in which Chief Justice PHILLIPS, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON joined.

Justice OWEN filed a dissenting opinion, in which Justice ENOCH and Justice BAKER joined.

Justice O'NEILL did not participate in the decision.

Justice OWEN, joined by Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON, concurring.

In 1999, the Legislature determined that partial deregulation of the electric power industry was in the public interest. To that end, the Legislature amended the Public Utility Regulatory Act (PURA).[1] In *City of Corpus Christi v. Public Utility Commission*,[2] also decided today, we describe in some detail the sections of the PURA that permit an electric utility to securitize regulatory assets and stranded costs as part of the transition to market-based retail electric rates. We need not repeat that discussion here.

TXU Electric Company filed an application with the Public Utility Commission for a financing order in which TXU sought to securitize $1.65 billion in regulatory assets and other costs and proposed to write off about $285 million in regulatory assets. The Commission allowed TXU to securitize $363 million of regulatory assets. TXU and several of the forty-four parties who had intervened in the proceedings before the Commission appealed to district court in Travis County. The district court held that: 1) the Commission did not err in applying a present value test in addition to the present value and revenue requirement tests set forth in sections 39.301 and 39.303(a) of the PURA; 2) the Commission had the discretion to consider TXU's regulatory assets on an asset-by-asset basis in determining whether securitization would provide tangible benefits to ratepayers; 3) the Commission should have examined how long it would take TXU to recover the regulatory assets at issue under the regulatory scheme established by the 1999 amendments to the PURA rather than under the previously existing regulatory scheme; 4) the Commission was not required to use the average life of the transition bonds that would be issued under the financing order in calculating the maximum amount that TXU could securitize; 5) the Commission's Finding of Fact 113 and references to that finding in Conclusion of Law 41 and Ordering Paragraph 37, regarding future treatment of reacquired debt securitized under the financing order, are advisory and have no *res judicata* effect; and 6) the Commission did not

1. Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543.

2. 51 S.W.3d 231 (Tex.2001).

err in its treatment of certain rate design, allocation, and true-up issues.

TXU, the Commission, the State of Texas, the Office of Public Utility Counsel, Texas Industrial Energy Consumers, Texas Retailers Association, the Steering Committee of Cities Served by TXU, the Coalition of Independent Colleges and Universities, and Nucor Steel, a division of Nucor Corporation, appealed directly to this Court pursuant to section 39.303(f) of the PURA.

## I

■ One of the principal issues in this appeal is how to determine the amount of regulatory assets that a utility may securitize under the PURA. Section 39.303(a) says that when a utility applies to recover its regulatory assets and eligible stranded costs, the Commission shall adopt a financing order upon finding that "the total amount of revenues to be collected under the financing order is less than the revenue requirement that would be recovered over the remaining life of the stranded costs using conventional financing methods and that the financing order is consistent with the standards in Section 39.301." [3] The parties disagree about what constitute "the standards in Section 39.301." Specifically, the parties diverge on how the Commission is to carry out section 39.301's directive that it "shall ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds." [4]

## A

Section 39.301 and the relevant parts of section 39.303 provide:

### § 39.301 Purpose

The purpose of this subchapter is to enable utilities to use securitization financing to recover regulatory assets and stranded costs, because this type of debt will lower the carrying costs of the assets relative to the costs that would be incurred using conventional utility financing methods. The proceeds of the transition bonds shall be used solely for the purposes of reducing the amount of recoverable regulatory assets and stranded costs, as determined by the commission in accordance with this chapter, through the refinancing or retirement of utility debt or equity. The commission shall ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds. The commission shall ensure that the structuring and pricing of the transition bonds result in the lowest transition bond charges consistent with market conditions and the terms of the financing order. The amount securitized may not exceed the present value of the revenue requirement over the life of the proposed transition bond associated with the regulatory assets or stranded costs sought to be securitized. The present value calculation shall use a discount rate equal to the proposed interest rate on the transition bonds. [5]

### § 39.303. Financing Orders; Terms

(a) The commission shall adopt a financing order, on application of a utility to recover the utility's regulatory assets and eligible stranded costs under Section 39.201 or 39.262, on making a finding that the total amount of revenues to be collected under the financing order is

3. Tex. Util.Code § 39.303(a).

4. *Id.* § 39.301.

5. *Id.*

less than the revenue requirement that would be recovered over the remaining life of the stranded costs using conventional financing methods and that the financing order is consistent with the standards in Section 39.301.

(b) The financing order shall detail the amount of regulatory assets and stranded costs to be recovered and the period over which the nonbypassable transition charges shall be recovered, which period may not exceed 15 years.

\* \* \*

(e) The commission shall issue a financing order under Subsections (a) and (g) not later than 90 days after the utility files its request for the financing order.[6]

All parties agree that there are at least two limitations on the maximum amount of regulatory assets or stranded costs that can be securitized. One limitation is found in the last two sentences of section 39.301. They require a present value test. The present value test expressly set forth in section 39.301 examines the revenue requirement over the life of the bonds, which under the PURA cannot exceed fifteen years.[7]

Another limitation on the amount that may be securitized is the revenue requirement test required by section 39.303(a). All parties agree that under that provision, the total revenues to be collected under the financing order, including the costs of issuing and servicing the bonds, must be less than the revenue requirement using conventional financing methods over the remaining life of the assets, which in this case is presently up to forty years. There is no present value test component in determining whether the total revenue requirement is met. The revenue requirement in total dollars over the life of the bonds is compared with the revenue requirement in total dollars over the remaining life of the regulatory assets.

The Commission and other parties to this appeal have taken the position that there is a third limitation on the amount that may be securitized. They contend that in order for the Commission to discharge its obligation to "ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds," the Commission is required to ascertain the present value of the revenue requirements of the regulatory assets without securitization, using the actual scheduled life of the assets under the regulatory scheme as it existed before the 1999 amendments to the PURA. The Commission maintains that it is then required to compare the outcome of that analysis with the present value computation specified in the final two sentences of section 39.301 to see if securitization results in a greater benefit to ratepayers.

The revenue requirement over the forty-year remaining life of the assets that TXU seeks to securitize was about $2.467 billion. Using the interest rates that TXU expected would apply to the transition bonds, the revenue requirement of the bonds was about $124 million less than $2.467 billion. Using TXU's "worst case" scenario for interest rates, the revenue requirement of the bonds was about $100,000 less than the $2.467 billion. TXU thus meets the revenue requirement test. However, the Commission argues that when the present value of transition charges collected over the twelve-year life of the transition bonds is compared with the present value of payment for the regulatory assets over their

---

6. *Id.* § 39.303(a), (b), (e).

7. *Id.* § 39.302(6).

forty-year life through utility rates, it can be seen that securitization will harm, not benefit, ratepayers. The Commission's financing order in this case reflects that if a remaining life of up to forty years for the regulatory assets is used in a present value analysis, the increased cost to ratepayers could be $204 million. Some of the intervenors assert that increased costs could be as much as $500 million, using a forty-year life without taking into account other benefits that there might be to ratepayers.

TXU takes the position that the Commission is not authorized to engraft onto the PURA's securitization provisions a present value test that is different from or in addition to the present value test expressly set forth in section 39.301. TXU contends that the only computations that the Legislature intended to be performed in determining the amount to be securitized are the two computations to be performed under sections 39.301 and 39.303(a), which are the present value calculation required by the last two sentences of section 39.301 and the total revenue test under section 39.303(a). TXU contends that the requirement that ratepayers receive a tangible and quantifiable benefit from securitization is measured by these tests and other considerations. TXU says that there are quantifiable benefits to ratepayers from securitizing the $1.65 billion of regulatory assets because to meet the total revenue test in section 39.303(a) and the present value test set forth in the last two sentences of section 39.301, TXU would write off and never recover from ratepayers approximately $285 million in regulatory assets.

The district court adopted somewhat of a middle ground. It concluded that the Commission had the discretion to apply a second present value test to determine whether securitization provides "tangible and quantifiable benefits" within the meaning of section 39.301. But the district court differed with the Commission about how the second present value test should be calculated. The district court concluded that the phrase "absent the issuance of transition bonds" in section 39.301 required the Commission to base its second present value calculation "on the asset recovery period that exists under the new regulatory scheme" of the PURA. More specifically, the district court held that the Commission's second present value test could not "lawfully be based upon the recovery periods under the earlier system of rate regulation that provided for asset lives up to 40 years."

For the reasons considered below, we conclude that the district court's construction of sections 39.301 and 39.303(a) best comports with the express provisions of the PURA. We agree with the district court that the Commission is authorized to impose a second present value test in determining the amount of regulatory assets or stranded costs that can be securitized, but in determining present value "absent the issuance of transition bonds," the Commission should use a remaining life for the assets that is far less than forty years. The PURA contemplates that the transition to "a fully competitive electric power industry" [8] will span considerably less than forty years.

**B**

We begin our analysis with the text of section 39.301. As indicated above, the sentence that gives rise to the controversy says, "The commission shall ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issu-

8. *Id.* § 39.001(a).

ance of transition bonds."[9] The first question that must be answered in order to satisfy this statutory requirement is what would happen to the regulatory assets at issue if they were not securitized.

The PURA provides that if a utility does not securitize all or some of its regulatory assets and stranded costs, they can be recovered through nonbypassable "competition transition charge[s]."[10] Section 39.201(k) gives the Commission discretion to determine the length of time over which regulatory assets and stranded costs may be recovered by this method.[11] All parties, including the Commission, agree that the Commission could shorten the remaining life over which regulatory assets and stranded costs will be recovered to a time period far less than the remaining life of up to forty years that those assets and costs would have had absent the 1999 amendments to the PURA. The determination of the appropriate recovery period would occur in a rate proceeding that is separate from securitization.

A large part of the regulatory assets that TXU seeks to securitize are Statement of Financial Accounting Standard (SFAS) 109 assets. SFAS 109 assets essentially represent amounts that TXU would have recovered under the former regulatory scheme from ratepayers over a period of forty years to pay federal income taxes that it will owe in connection with expenditures it made in the past that were capitalized instead of expensed. The Commission asks this Court to authorize a present value test for these assets based on a remaining life of forty years even though the Commission knows that in all probability, under section 39.201(k), it will shorten the remaining life to something far less than forty years. Notwithstanding the Commission's recognition of this fact, it maintains that the district court erred in requiring it to use a remaining life of less than forty years because amount of any reduction to the forty-year recovery period has yet to be determined. The Office of Public Utility Counsel similary argues says that "the essential problem with the lower court's position is that neither TXU, the District Court, or anyone else can state with any level of precision over what period the non-securitized assets will be recovered."

Although there may be some uncertainty as to precisely how much the Commission would shorten the recovery period for the regulatory assets at issue if they were not securitized, that uncertainty does not justify the use of a forty-year life. The PURA contemplates a far shorter recovery period for regulatory assets and other stranded costs that are not securitized but are instead recovered through competition transition charges. Each electric utility was required to file by April 1, 2000 proposed tariffs that included any expected competition transition charges. All or any part of a utility's regulatory assets that are not securitized can be recovered through competition transition charges.[12] Section 39.201(k) sets forth the factors that the Commission is to consider in determining the length of time over which stranded costs, including regulatory assets, will be recovered.[13] The PURA indicates that a

9. *Id.* § 39.301.

10. *Id.* § 39.201.

11. *Id.* § 39.201(k).

12. *See id.* § 39.201(i).

13. Section 39.201(k) provides:

(k) In determining the length of time over which stranded costs under Subsection (h) may be recovered, the commission shall consider:

(1) the electric utility's rates as of the end of the freeze period;

considerable portion of these costs are to have been recovered within the two-year period after customer choice begins on January 1, 2002.[14] Section 39.201(*l*) provides for a true-up proceeding in January 2004 in which adjustments may be made to recover "any remaining stranded costs."[15] The Commission may extend the collection period for competition transition charges, if necessary.[16] This indicates that the recovery period for the competition transition charge initially set by the Commission will be a relatively short period of time, and that any extension will likewise be a relatively short period of time. Section 39.262 contemplates that if, during the 2004 true-up proceeding, there are stranded costs in addition to those previously estimated, those remaining costs can be added to the amounts to be recovered by competition transition charges, or at the

utility's option, securitized through bonds that cannot have a life longer than fifteen years.[17] The fact that a utility may securitize remaining stranded costs and regulatory assets, but over a period of time not to exceed fifteen years,[18] indicates that the Legislature had something considerably less than forty years in mind for the transition to "a fully competitive electric power industry."[19]

Statements made by PUC Commissioners at an open meeting in this case are consistent with our understanding of the Legislature's intent. Those Commissioners indicated that competition transition charges, which would be the method for recovering regulatory assets and stranded costs absent securitization, would be collected over a period of time that would be unlikely to exceed fifteen years and that

(2) the sum of the transmission and distribution charges and the system benefit fund fees;

(3) the proportion of estimated stranded costs to the invested capital of the electric utility; and

(4) any other factor consistent with the public interest as expressed in this chapter. *Id.* § 39.201(k).

14. Section 39.102(a) provides that customer choice begins, with certain exceptions not material here, on January 1, 2002. *Id.* § 39.102(a).

15. Section 39.201(*l*) says:

Two years after customer choice is introduced, the stranded cost estimate under this section shall be reviewed and, if necessary, adjusted to reflect a final, actual valuation in the true-up proceeding under Section 39.262. If, based on that proceeding, the competition transition charge is not sufficient, the commission may extend the collection period for the charge or, if necessary, increase the charge. Alternatively, if it is found in the true-up proceeding that the competition transition charge is larger than is needed to recover any remaining stranded costs, the commission may:.... *Id.* § 39.201(*l*).

16. *Id.*

17. Section 39.262(c) provides:

(c) After January 10, 2004, at a schedule and under procedures to be determined by the commission, each transmission and distribution utility, its affiliated retail electric provider, and its affiliated power generation company shall jointly file to finalize stranded costs under Subsections (h) and (i) and reconcile those costs with the estimated stranded costs used to develop the competition transition charge in the proceeding held under Section 39.201. Any resulting difference shall be applied to the nonbypassable delivery rates of the transmission and distribution utility, except that at the utility's option, any or all of the remaining stranded costs may be securitized under Subchapter G.

*Id.* § 39.262(c). The recovery period for transition charges under the PURA's securitization scheme is limited to fifteen years by section 39.303(b), and the life of transition bonds is similarly limited to fifteen years by section 39.302(6). *Id.* §§ 39.303(b), 39.302(6).

18. *Id.* § 39.303(b).

19. *Id.* § 39.001(a).

could be as few as eight years. Those statements are not binding, but they indicate that the Commission understands that the Legislature did not intend for the transition to a fully competitive market to be protracted.

We therefore conclude that the district court did not err in holding that the Commission could employ a present value test in addition to the present value test expressly set forth in section 39 .301, but that the Commission must assume that absent securitization, regulatory assets and stranded costs would be recovered through competition transition charges in considerably less than forty years.

## II

■ The financing order in this case approved the issuance of a series of transition bonds with differing maturity dates TXU explains that this was designed to allow its regulatory assets to be securitized at the lowest overall interest rate on the best possible terms, and no one takes issue with that assertion. The bonds' maturity dates range from one to twelve years after their issuance. TXU contends that in performing the present value test set forth in the last two sentences of section 39.301,[20] the Commission should have used the weighted average life over which the bonds will be outstanding, which would be approximately six years, rather than twelve years. We approve of the Commission's methodology.

The Commission's method of calculating present value takes into account the actual timing of bond payments until the last

payment is made on the oldest bond. The Commission concluded, and we agree, that accounting for the actual timing of payments is necessary to determine present value. TXU's averaging method does not mathematically account for transition charges that will be collected until the last of the series of transition bonds matures twelve years from the date of issuance.

## III

■ Another significant issue presented is whether, in determining the amount to be securitized, the Commission must consider the regulatory assets or other stranded costs to be securitized in the aggregate or, instead, may conduct an asset-by-asset analysis. We conclude that the Commission must consider regulatory assets in the aggregate for the same reasons expressed in *Corpus Christi.*[21]

Briefly, what is at issue in this case are regulatory assets that do not currently earn a return. The majority of TXU's regulatory assets fall into this category. Among TXU's regulatory assets that earn no return are approximately $1.45 billion in SFAS 109 assets. As explained above, these assets essentially represent amounts that TXU would have recovered under the former regulatory scheme from ratepayers to pay federal income taxes that it will owe, when it recovers through rates, expenditures it made in the past that were capitalized instead of expensed.

Some of TXU's regulatory assets do earn a return, as much as 13.637 percent. The proposed interest rate on TXU's transition bonds was 7.24 percent. According-

---

**20.** The last two sentences of section 39.301 provide:

The amount securitized may not exceed the present value of the revenue requirement over the life of the proposed transition bond associated with the regulatory assets or stranded costs sought to be securitized. The present value calculation shall use a discount rate equal to the proposed interest rate on the transition bonds.

*Id.* § 39.301.

**21.** 51 S.W.3d at 231 – 255.

ly, there was considerable room to aggregate some of TXU's regulatory assets that earned no return with regulatory assets that earn a relatively high rate of return and still have a net benefit to ratepayers from securitization.

The State of Texas, the Office of Public Utility Counsel, and Texas Industrial Energy Consumers have taken the position that to maximize the benefit of securitization to ratepayers, all regulatory assets that do not earn a rate of return should be declared ineligible for securitization. The State and those aligned with it on these issues contend that each regulatory asset must be analyzed on a stand-alone basis to determine if securitization of that asset benefits ratepayers. As we explain in *Corpus Christi*, the PURA does not support that position.[22] The PURA says that all regulatory assets are to be securitized on application of a utility, subject to the requirement that "the total amount of revenues to be collected under the financing order" meets certain requirements.[23] The PURA defines "regulatory asset" with specificity.[24] Regulatory assets are defined with reference to a utility's 1998 Securities and Exchange Commission Form 10–K, which lists regulatory assets. A utility is entitled to securitize 100 percent of its regulatory assets,[25] subject only to the tests in sections 39.303(a) and 39.301.[26] The present value test in section 39.301 ensures that a utility will not recover a return on these assets higher than the return it would receive under the existing regulatory scheme. Neither the present value test nor the requirement in section 39.301 that the Commission "ensure that securitization provides tangible and quanti-fiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds"[27] authorizes the Commission to "maximize" benefits to ratepayers by refusing to securitize certain types of regulatory assets when 100 percent of regulatory assets are "qualified costs" under the PURA.[28]

The district court erred in concluding that the Commission has the discretion to consider regulatory assets on an asset-by-asset basis. Because the Commission did not consider the regulatory assets and other costs that TXU sought to securitize in the aggregate, the Commission must do so on remand.

## IV

■ A number of parties have challenged the manner in which the Commission allocated transition charges among customer classes. TXU proposed and the Commission adopted seven regulatory asset recovery classes for purposes of collecting transition charges. Those classes and the regulatory asset allocation factors assigned to each under section 39.253 are:

| Class: | Allocation Factor: |
| --- | --- |
| Residential | 41.2705% |
| General Service—Secondary | 44.7323% |
| General Service—Primary | 5.8982% |
| High Voltage Service | 2.7875% |
| Lighting Service | 0.6836% |
| Instantaneous Interruptible | 1.8568% |
| Noticed Interruptible | 2.7711% |
| *Total* | 100.0000% |

Nucor Steel is in the Instantaneous Interruptible regulatory asset recovery class. Nucor Steel is a nonfirm, also known as an interruptible, customer on TXU's system. A utility may interrupt service to an interruptible customer for specified reasons, typically during periods of high demand from other customers on that utility's system. Texas Industrial Energy Consumers

22. *Id.*

23. Tex. Util.Code § 39.303(a).

24. *Id.* § 39.302(5).

25. *Id.* §§ 39.302(4), 39.201(i)(1).

26. *Id.* §§ 39.303(a), 39.301.

27. *Id.* § 39.301.

28. *Id.* § 39.302(4).

(TIEC) is a voluntary association of companies that operates industrial facilities in TXU's service area. Nucor Steel and TIEC take issue with how the Commission determined the percentage of transition costs each customer class would bear. Nucor Steel and TIEC assert that the Commission should have used the more current, 1999 data rather than the data used in TXU's most recent rate-design case, which was 1997 data.

The pertinent section of the PURA is 39.253(c)-(h).[29] As we explain in greater detail in *Corpus Christi*,[30] the allocation of stranded costs under section 39.253 has two basic components. One is determined by applying the same "methodology used to allocate the costs of the underlying assets in the electric utility's most recent commission order addressing rate design."[31] The other is the energy consumption of the respective classes[32] "based on the relevant class characteristics as of May 1, 1999, adjusted for normal weather conditions."[33] The question presented here is whether the Commission should apply the same methodology used in TXU's last rate design case to the data used in that rate case, or whether the

Commission is free to choose more recent data.[34]

We conclude in *Corpus Christi* and in this case that the PURA is unclear in this regard.[35] In such a situation, we give some deference to the Commission as long as its interpretation of a code provision is a reasonable one and does not conflict with the code's language.[36] The Commission construed section 39.253 to mean that the methodology used in a utility's last rate design case is to be applied to the data used in that rate case. That is a reasonable construction of the PURA that does not contradict any of its language, and we agree with the Commission's construction.

## V

Several parties who are also parties in *Corpus Christi* raise many of the same issues in both cases.[37] Our decision in CP & L resolves each of these issues, and we will not lengthen this opinion by reiterating all the reasons for our holdings. We instead briefly summarize each issue and our disposition.

Certain of TXU's customers assert that the Commission failed to follow section 39.253 in allocating transition costs to the

29. *Id.* § 39.253(c)-(h).

30. 51 S.W.3d at 257.

31. Tex. Util.Code § 39.253(c)-(e).

32. *Id.* § 39.253(c).

33. *Id.* § 39.253(g).

34. *Cf. Corpus Christi*, 51 S.W.3d at 259.

35. *Id.*

36. *See Stanford v. Butler*, 142 Tex. 692, 181 S.W.2d 269, 273 (1944) (observing that courts will ordinarily adopt and uphold a construction placed upon a statute by a department charged with its administration if the statute is ambiguous or uncertain, and the construc-

tion is reasonable); *Texas Ass'n of Long Distance Tel. Cos. v. Pub. Util. Comm'n*, 798 S.W.2d 875, 884 (Tex.App.—Austin 1990, writ denied) (observing that construction of a statute by an administrative agency charged with its enforcement is entitled to great weight, particularly if the statute is ambiguous, so long as the agency's construction is reasonable and does not contradict the plain language of the statute); Tex. Gov't Code § 311.023(6) (providing that in construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider the administrative construction of the statute).

37. Those parties include the Office of Public Utility Counsel, Texas Industrial Consumers, and Nucor Steel, who filed an amicus brief with this Court in *Corpus Christi*.

non-firm industrial customer classes. They contend that the Commission erred in applying the 150 percent demand allocator required by section 39.253(d)[38] to all the transition costs rather than first subtracting the transition costs allocated to residential customers. We hold in this case, as we do in *Corpus Christi*, that section 39.253 is ambiguous in this regard and that the Commission's construction is a reasonable one and should be accorded deference.

TIEC says that in determining how much of the transition costs should be allocated to the industrial classes, the Commission should have excluded load lost when customers switched to sources of power that exempt them from paying transition charges.[39] Again, for the reasons we consider in *Corpus Christi*, we reject that argument.[40]

## VI

◼ Several parties to this appeal, including the Commission, contend that the district court erred when it held that the Commission's Finding of Fact 113 and references to that finding in Conclusion of Law 41 and Ordering Paragraph 37 were "advisory and superfluous to the Order and therefore [have] no *res judicata* effect." The finding of the Commission that is at issue concerned loss on reacquired debt.

TXU reacquired preferred stock and high-cost debt before the maturity date of that debt by paying a premium. The loss TXU sustained in those transactions is included in the definition of regulatory as-

sets under the PURA, and the Commission allowed TXU to include loss on reacquired debt as part of the amount securitized in the financing order. This same loss on reacquired debt is also reflected as an increase in TXU's cost of capital, and that in turn increases TXU's rate of return. The Commission and others were concerned that TXU would enjoy a double recovery of its losses. Responding to that concern, the Commission concluded that loss on reacquired debt "should not be removed from [TXU's] cost-of-capital calculation for purposes of the annual report submitted pursuant to PURA § 39.257," but that instead an adjustment should be made in future proceedings.[41] In the Financing Order, Finding of Fact 113, the Commission said that:

[A]n adjustment should be made in the true up proceeding under PURA § 39.262 to account for the effect of securitizing the loss on reacquired debt on [TXU's] cost of capital. This treatment is necessary to comply with the Legislature's mandate in PURA § 39.262(a) that a utility and its affiliates "may not be permitted to overrecover stranded costs" by using any of the methods provided in Chapter 39 [§ 39.262(a)]. In addition, any determinations regarding the effect of securitizing loss on reacquired debt on the calculation of stranded costs should not be made in this docket but should be made in [TXU's] cost unbundling case under PURA § 39.201.[42]

We agree with the district court that this was an advisory and premature find-

**38.** TEX. UTIL.CODE § 39.253(d) (requiring that "[n]on-firm industrial customers shall be allocated stranded costs equal to 150 percent of the amount allocated to that class").

**39.** *See id.* § 39.262(k).

**40.** 51 S.W.3d at 259–261.

**41.** Tex. Pub. Util. Comm'n, *Application of TXU Electric Company for Financing Order to Securitize Regulatory Assets and Other Qualified Costs*, Docket No. 21527 (May 2, 2000).

**42.** *Id.* (footnote omitted).

ing. Whether an adjustment is required in a true-up or other future proceeding should await resolution in that proceeding.

\* \* \* \* \*

For the reasons considered above, we conclude that: 1) in order to ensure that securitization provides tangible and quantifiable benefits to ratepayers greater than would have been achieved absent the issuance of transition bonds, the Commission may apply a present value test in addition to the present value and revenue requirement tests expressly set forth in sections 39.301 and 39.303(a) of the PURA; 2) in applying an additional present value test, the Commission should assume that recovery of regulatory assets and stranded costs absent securitization would occur in substantially less than forty years; 3) the Commission must consider regulatory assets that a utility seeks to securitize in the aggregate to determine whether those assets meet the requirements for securitization and cannot categorically exclude certain types of regulatory assets from securitization; 4) section 39.253 permits the Commission to apply the rate design methodology established in a utility's last rate design case to the data in that rate case rather than to more current data, in order to establish demand allocation factors that determine how transition charges are to be allocated among classes of customers; 5) none of the other issues regarding allocation of transition costs among classes of customers has merit; and 6) certain findings of fact and conclusions of law by the Commission are advisory.

Justice HECHT, joined by Chief Justice PHILLIPS, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON, concurring.

We join fully in the Court's judgment and in Justice Owen's concurring opinion.

This is the opinion of the Court regarding the validity of the "non-standard true-up" included in the Public Utility Commission's financing order for TXU Electric Company.

■ The financing order for TXU contains a non-standard true-up procedure essentially identical to the one in the financing order for Central Power and Light Company, which we approve today in *City of Corpus Christi v. Public Utility Commission*, 51 S.W.3d 231 (Tex.2001). A Commission witness testified that if any TXU customer class experienced a decrease in power usage of more than six to nine percent, that class would be "at risk for a cascading loss scenario." The arguments for and against that procedure in this case are the same as those made in *Corpus Christi* with one exception. Nucor Steel, one of TXU's largest customers, argues that any overpayments or underpayments of transition charges by any one class should be reallocated among all TXU's customers, thereby fully cross-collateralizing responsibility for the transition as TXU proposed to the Commission. Without deciding whether the Commission was empowered to depart this far from the allocation requirements of section 39.253, we easily conclude that the Commission was not required to adopt this approach instead of the somewhat more restricted non-standard true-up. For the same reasons explained in our concurring opinion in that case, we approve of the non-standard true-up procedure in this case.

Justice OWEN, joined by Justice ENOCH and Justice BAKER, dissenting.

The financing order for TXU contains a non-standard true-up provision that is virtually identical to the non-standard true-up provision at issue in *City of Corpus Christi*

*v. Public Utility Commission,*[1] which the Court also decides today. For the reasons set forth in my dissent in that case, I also dissent from the Court's approval of the non-standard true-up procedure in TXU's financing order.