ACCEPTED
03-14-00340-CV
4961132
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/20/2015 5:45:55 PM
JEFFREY D. KYLE
CLERK



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/20/2015 5:45:55 PM
JEFFREY D. KYLE
Clerk

MEGAN NEAL
ASSISTANT ATTORNEY GENERAL

(512) 475-4009
megan.neal@texasattorneygeneral.gov

April 20, 2015

Honorable Jeffrey D. Kyle, Clerk                                   *Via Electronic Filing*
Court of Appeals, Third District of Texas
P.O. Box 12547
Austin, TX 78711-2547

Re:     No. 03-14-00340-CV,

        Appellants, CPS Energy, Time Warner Cable Texas LLC, and Southwestern
        Bell Telephone Company d/b/a AT&T// Cross-Appellant Public Utility
        Commission of Texas,
        v. Appellee, Public Utility Commission of Texas// Cross Appellee, CPS
        Energy, Time Warner Cable Texas LLC, and Southwestern Bell Telephone
        Company d/b/a AT&T.

Dear Mr. Kyle:

        In preparation for oral argument in this case, we determined the Court does not
have jurisdiction to decide one of the issues. CPS Energy does not have standing to
question the Commission's declarations regarding amendments to the applicable federal
regulation. (CPS Energy's Appellant's Point of Error No. 2; Findings of Fact 84-87;
Conclusion of Law 27.) Those amendments became effective on June 8, 2011—several
months after the time period for which the Commission determined the maximum
allowable pole-attachment rate. That period ended with CPS Energy's test year 2009,
billing year 2010. Thus, the Court cannot review this issue.

        This Court and the Texas Supreme Court have held that statements about the
future are advisory and a party does not have standing to complain about them. The two
attached cases demonstrate these holdings. Please provide copies to the Court.

Thank you for your assistance.

/s/ *Megan Neal*
Megan Neal
Assistant Attorney General
State Bar No. 24043793
(512) 475-4009 Tel.
(512) 457-4639 Fax

cc:     Counsel of record w/ attachments
        Stephen Journeay - PUC

## Certificate of Service

I certify that a true and correct copy of this document was electronically filed with the Court of Appeals for the Third District of Texas. All counsel were served with a true and correct copy of this document electronically or by email on the 20th day of April, 2015, to the following:

| | |
|---|---|
| Alfred R. Herrera<br>Felipe Alonso III<br>HERRERA & BOYLE, PLLC<br>816 Congress Avenue, Suite 1250<br>Austin, TX 78701<br>(512) 474-1492<br>(512) 474-2507 (fax)<br>aherrera@aherreraboylelaw.com<br>falonso@aherreraboylelaw.com<br><br>Curt D. Brockman<br>CPS Energy<br>145 Navarro<br>P. O. Box 1771<br>San Antonio, TX 78296<br>(210) 353-5689<br>(210) 353-6832 (fax)<br>cdbrockmann@cpsenergy.com<br>**Attorneys for CPS Energy** | Michael T. Sullivan<br>MAYER BROWN LLP<br>71 S. Wacker Drive<br>Chicago, IL 60606<br>(312) 782-0600<br>(312) 706-8689 (fax)<br>msullivan@mayerbrown.com<br><br>Joseph E. Cosgrove, Jr.<br>Katherine C. Swaller<br>Thomas Ballo<br>AT&T LEGAL DEPARTMENT<br>816 Congress Avenue, Suite 1100<br>Austin, TX 78701<br>(512) 457-2304<br>(512) 870-3420 (fax)<br>joseph.cosgrove.jr@att.com<br>katherine.swaller@att.com<br>thomas.ballo@att.com |

Valerie P. Kirk
Melissa Lorber
ENOCH KEVER PLLC
600 Congress Avenue, Suite 2800
Austin, TX 78701
(512) 615-1200
(512) 615-1198 (fax)
vkirk@enochkever.com
mlorber@enochkever.com
**Attorneys for Time Warner**

Paul A. Drummond
Natalie L. Hall
AT&T LEGAL DEPARTMENT
1010 N. St. Mary's, Rm 14Q
San Antonio, TX 78215
(210) 351-4830
(210) 886-2127 (fax)
paul.drummond@att.com
natalie.hall@att.com
**Attorneys for AT&T**

John Davidson Thomas
Paul A. Werner
James Aaron George
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W.
Suite 100
Washington, D.C. 20006
(202) 747-1900
(202) 747-1901 (fax)
dthomas@sheppardmullin.com
pwerner@sheppardmullin.com
ageorge@sheppardmullin.com
**Attorneys for Time Warner**

*/s/ Megan Neal*
Megan Neal

Not Reported in S.W.3d, 2014 WL 4058727 (Tex.App.-Austin)
**(Cite as: 2014 WL 4058727 (Tex.App.-Austin))**



Briefs and Other Related Documents

Judges and Attorneys

Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
Austin.
The RAILROAD COMMISSION OF TEXAS, Appellant
v.
CENTERPOINT ENERGY RESOURCES CORP. d/b/a CenterPoint Energy Entex and CenterPoint Energy Texas Gas, Appellee.
The Railroad Commission of Texas, Appellant
v.
Texas Gas Service Company, a Division of ONEOK, Inc., Appellee.
The Railroad Commission of Texas, Appellant
v.
CenterPoint Energy Resources Corp. d/b/a CenterPoint Energy Entex and CenterPoint Energy Texas Gas, Appellee.

Nos. 03–13–00533–CV,
03–13–00534–CV, 03–13–00535–CV.
Aug. 14, 2014.

From the District Court of Travis County, 98th Judicial District, No. D–1–GN–10–003981, Stephen Yelenosky, Judge Presiding.
From the District Court of Travis County, 200th Judicial District, No. D–1–GN–10–003983, Stephen Yelenosky, Judge Presiding.
From the District Court of Travis County, 126th Judicial District, No. D–1–GN–10–003982, Stephen Yelenosky, Judge Presiding.
Douglas Fraser, Assistant Attorney General, Environmental Protection Division, Kellie E. Billings, Assistant Attorney General, Environmental Protection & Admin. Law Division, Austin, TX, for Appellant.

Dane McKaughan, Greenberg Traurig, LLP, Austin, TX, for Appellee.

Before Justices PURYEAR, GOODWIN, and FIELD.

***MEMORANDUM OPINION***
MELISSA GOODWIN, Justice.

**\*1** The Texas Railroad Commission (the Commission) appeals the trial court's reversal in part of its final orders in three annual review proceedings under cost-of-service adjustment (COSA) tariffs involving essentially identical issues. CenterPoint Energy Resources Corp. d/b/a CenterPoint Energy Entex and CenterPoint Energy Texas Gas (CenterPoint) and Texas Gas Service Company, a Division of ONEOK, Inc. (Texas Gas) (the Utilities) sued for judicial review of final orders issued by the Commission denying the Utilities' recovery of certain expenses for meals, lodging, and other items and ordering certain guidelines for recovery of similar expenses in future COSA reviews. Because we conclude that the Utilities' claims are not ripe, we reverse the trial court's judgment and dismiss the Utilities' claims.

**FACTUAL AND PROCEDURAL BACKGROUND**
In April 2010, the Utilities applied for

cost-of-service adjustments to their rates pursuant to annual reviews authorized under their respective COSA tariffs for certain service areas. Rates for the affected customers were initially determined in contested case hearings that resulted in the adoption of tariffs with COSA clauses. A COSA clause is a formula included in a utility's tariff that allows adjustments to customer charges without the necessity of a full-blown "Statement of Intent" rate case. *See Texas Coast Utils. Coal. v. Railroad Comm'n,* 423 S.W.3d 355, 357, 374 (Tex.2014) (upholding authority of Commission to adopt gas utility rate schedule providing for automatic annual adjustments based on increases or decreases in utility's cost of service, i.e., COSA clause). The terms of a COSA clause vary depending on what is approved as part of the tariff in the rate case. The tariffs in these cases provide that the annual rate adjustment is to be determined by a calculation based on calendar year operating expenses, return investment, and certain taxes. If the resulting change is positive, the amount charged goes up; if it is negative, the amount charged goes down. The adjustment is capped at 5% of the customer charge that was in effect at the end of the preceding calendar year in CenterPoint's tariffs and at the percentage change in the Consumer Price Index for All Urban Consumers in Texas Gas's tariff. These were the first COSA filings made by the Utilities under their respective tariffs.

A COSA tariff annual review is a streamlined procedure that does not include a hearing; instead, the adjustment is determined following staff review of the evidence filed by the utility. In each of the present cases, the Commission questioned and ultimately disallowed certain expenses for meals, travel, and other items for which the Utilities could not produce itemized receipts.[FN1] In its final orders, the Commission made certain findings of fact and conclusions of law concerning the disallowed expenses and included two "ordering paragraphs" requiring the Utilities to meet certain evidentiary criteria for recovery of similar expenses in the future.[FN2] The two ordering paragraphs provided:

> FN1. The removal of the disputed expenses did not result in any change to the Utilities' proposed adjustments, and the record reflects that the Utilities withdrew their requests for the questioned expenses.

> FN2. In each case, calculation errors not relevant to this appeal were corrected and a nunc pro tunc order issued.

**\*2 IT IS FURTHER ORDERED** that [the Utilities] shall not include any employee or contractor expenses from employee or contractor expense reports reimbursement in future COSA filings that cannot be supported by a detailed itemized receipt which shows the specific amounts and line item charges.

**IT IS FURTHER ORDERED** that [the Utilities] shall identify and justify each meal expense that exceeds $25.00 per person and any lodging expense over $150.00 per person per night that [the Utilities] propose[ ] to include in future COSAs.

The Utilities filed motions for rehearing complaining that the findings of fact, conclusions of law, and ordering paragraphs concerning the disallowed expenses were statements of new policy, not backed by any rule or guideline, and were therefore made through unlawful procedure, ar-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

bitrary and capricious, and not supported by substantial evidence. The Commission denied the motions for rehearing, and the Utilities filed suits for judicial review asserting the same claims. *See* Tex. Util.Code § 105.001(a) (any party to proceeding before Commission entitled to judicial review under substantial evidence rule). The Commission filed motions to dismiss based, in part, on its contention that the Utilities were requesting advisory opinions because their claims are not ripe. The trial court denied the Commission's motions to dismiss and reversed the final orders, finding that the Commission acted arbitrarily and capriciously by imposing a new policy in the orders and that the policy was made through unlawful procedure and was not supported by substantial evidence. These appeals followed.

## DISCUSSION

In its first issue, the Commission argues that the Utilities' claims are not ripe and they therefore seek an impermissible advisory opinion.[FN3] The Commission contends that the Utilities request a predetermination of a hypothetical matter that could arise in the future, which is not a matter fit for judicial consideration. The Utilities argue that the orders "expressly appl [y] ... to future COSA proceedings," "mandate the manner in which all future rate adjustments filed pursuant to the applicable COSA tariff will be resolved," and "fundamentally change the way in which COSA adjustments are calculated in future COSA proceedings." They further contend that the orders place "obligations and burdens on [them] *now,* and that failure to abide by these new obligations and burdens could bar recovery in a future COSA proceeding." Thus, the Utilities contend, they seek real relief and an opinion that will affect "all COSA cases [they] will file in the future," not an advisory opinion.

> FN3. The Commission also contends that the Utilities lack standing because in their motions for rehearing, they did not challenge the Commission's final decisions on rate adjustments and instead attacked only the underlying findings of fact and conclusions of law. This Court has held that to have standing to seek judicial review, one must be aggrieved by the final order and not merely by an underlying finding or conclusion, *see GTE Sw. Inc. v. Public Util. Comm'n of Tex.,* 37 S.W.3d 546, 548 (Tex.App.-Austin 2001, no pet.) (citing *Champlin Exploration, Inc. v. Railroad Comm'n,* 627 S.W.2d 250, 252 (Tex.App.-Austin 1982, writ ref'd n.r.e.)). However, the Utilities' motions for rehearing expressly challenged the ordering paragraphs as well as the findings and conclusions. We overrule the Commission's first issue as to this argument.

"The courts of this state are not empowered to give advisory opinions[, and] [t]his prohibition extends to cases that are not yet ripe." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.,* 971 S.W.2d 439, 443 (Tex.1998) (citations omitted). The ripeness doctrine "serves to avoid premature adjudication" and "focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Perry v. Del Rio,* 66 S.W.3d 239, 250 (Tex.2001) (citations omitted). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Patterson,* 971 S.W.2d at 443. "Ripeness is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

both a question of timing, that is, when one may sue, a question of discretion, or whether the court *should* hear the suit, and not whether it *can* hear the suit." *Atmos Energy Corp. v. Abbott,* 127 S.W.3d 852, 858 (Tex.App.-Austin 2004, no pet.) (internal citations omitted) (citing *Perry,* 66 S.W.3d at 249–50; *Patterson,* 971 S.W.2d at 442; *City of Waco v. Texas Natural Res. Conserv. Comm'n,* 83 S.W.3d 169, 177 (Tex.App.-Austin 2002, pet. denied)). "In the administrative-law context, moreover, avoiding premature litigation over administrative determinations prevents courts from 'entangling themselves in abstract disagreements over administrative policies' while simultaneously allowing the agency to perform its functions unimpeded." *Trinity Settlement Servs., LLC v. Texas State Secs. Bd.,* 417 S.W.3d 494, 506 (Tex.App.-Austin 2013, pet. denied) (quoting *Patterson,* 971 S.W.2d at 443). The determination of ripeness depends on "(1) the fitness of the issues for judicial decision; and (2) the hardship occasioned to the party by the court's denying judicial review." *Atmos Energy,* 127 S.W.3d at 858 (citing *Perry,* 66 S.W.3d at 250 (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *City of Waco,* 83 S.W.3d at 177)). Ripeness should be decided on the basis of all the information available to the court, and we may consider intervening events that occur after the decision in the lower court. *Perry,* 66 S.W.3d at 250; 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure* § 3532.1, at 136–37 (2d ed.1984).

**\*3** We do not believe the Utilities have affirmatively established that the issues they presented were fit for review and that the failure to address those issues would constitute a hardship on the Utilities. *See Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 858. Whether there may be an actual controversy between the Utilities and the Commission is too uncertain and speculative to support the Utilities' contention that their claims are ripe. Because the Utilities complain of future enforcement, they must show that enforcement is "imminent or sufficiently likely." *See Trinity Settlement,* 417 S.W.3d at 506; *Rea v. State,* 297 S.W.3d 379, 383 (Tex.App.-Austin 2009, no pet.) (to establish ripeness, plaintiffs must demonstrate injury is imminent, direct, and immediate, not merely remote, conjectural, or hypothetical); *Atmos Energy,* 127 S.W.3d at 856; *City of Waco,* 83 S.W.3d at 175. A perceived threat of enforcement does not create a justiciable controversy. *Compare Mitz v. Texas State Bd. of Veterinary Med. Exam'rs,* 278 S.W.3d 17, 25 (Tex.App.-Austin 2008, pet. dism'd), *with Beacon Nat'l Ins. Co. v. Montemayor,* 86 S.W.3d 260, 267–68 (Tex.App.-Austin 2002, no pet.).

The Utilities attempt to characterize their claims as ripe by arguing that the language of the ordering paragraphs will require them to meet evidentiary requirements in all future annually required COSA filings and that the orders place "obligations and burdens" on them now. Tellingly, however, the Utilities argue that their failure to meet these obligations and burdens *could* bar recovery in a *future* COSA proceeding. This perceived threat as to future COSA filings does not rise to the level of imminent or likely injury so as to present a justiciable claim. *See Mitz,* 278 S.W.3d at 25 (contrasting actual initiation of administrative action suggesting imminent proceeding in that case with mere perceived threat in *Beacon Nat'l,* 86 S.W.3d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

267–68). And while we may consider intervening events that occur after a decision in the lower court, *see Perry,* 66 S.W.3d at 250, the Utilities have not presented any evidence that the Commission has taken any steps to impose the requirements on them since issuing the final orders or that there is any existing or continuing threat of liability or penalty. *Cf. Mitz,* 278 S.W.3d at 25–26 (constitutional claim ripe for review considering continuing threat of civil and criminal liability against practitioners and direct effect act had on business enterprise); *Patel v. Texas Dep't of Licensing & Regulation,* No. 03–11–00057–CV, 2012 Tex.App. LEXIS 6187, at *23,2012 WL 3055479 (Tex.App.-Austin July 25, 2012, pet. granted) (constitutional claims ripe where appellants subject to continuing threat of civil and criminal liability, as well as administrative penalties and sanctions). Thus, the Utilities have not established that enforcement is imminent or sufficiently likely, *see Trinity Settlement,* 417 S.W.3d at 506; *Atmos Energy,* 127 S.W.3d at 856; *City of Waco,* 83 S.W.3d at 175, and we conclude that the Utilities' issues are not fit for judicial review, *see Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 858.

**\*4** To prevail, the Utilities must show that they would suffer hardship if judicial review is withheld until enforcement of the requirements in the ordering paragraphs. *See Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 858. Hardship is shown when the statute, rule, or policy at issue " 'requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.' " *Mitz,* 278 S.W.3d at 26 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 153, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). When the requirement at issue has a direct and immediate impact on the party's business and places it in jeopardy of sanction or penalty, that is sufficient to show a hardship. *Id.; Atmos Energy,* 127 S.W.3d at 859.

Here, the ordering paragraphs require the Utilities to present itemized receipts and identify and justify certain expenses if they want the Commission to allow their inclusion in the calculation of future adjustments. Documenting and justifying expenses to be included in rate calculations does not constitute "a significant change in [the Utilities'] conduct." *See Abbott Labs.,* 387 U.S. at 153; *Mitz,* 278 S.W.3d at 26; *see also* 18 C.F.R. pt. 201, General Instructions, (2) Records (A) (Federal Energy Regulatory Commission's (FERC's) Uniform System of Accounts (USOA) (providing utilities shall keep books and records "so as to be able to furnish readily full information as to any item included in any account" and support each entry shall "by such detailed information as will permit ready identification, analysis, and verification of all facts relevant thereto"); 16 Tex. Admin. Code § 7.310(a) (Railroad Comm'n of Tex., System of Accounts (requiring gas utilities to use FERC's USOA for all operating and reporting purposes); Tex. Util.Code § 104.008(1) (in proceeding involving rate change proposed by utility, utility has burden of proving rate change is just and reasonable); *City of Amarillo v. Railroad Comm'n,* 894 S.W.2d 491, 498 (Tex.App.-Austin 1995, writ denied) (in any proceeding to change rates, utility bears burden of proof to show rate change and components thereof, such as operating expenses, are just and reasonable).

Moreover, the Utilities have not made the requisite showing of hardship. *See Perry,* 66 S.W.3d at 250; *Atmos Energy,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

127 S.W.3d at 859–60. Significantly, they are not aggrieved by the Commission's disallowance of undocumented expenses, which did not result in any changes to their requested rates. Nor do they face any other sanction or penalty for noncompliance. *See Atmos Energy,* 127 S.W.3d at 859 (concluding appellants were not in jeopardy of sanction or penalty because violation of statute carried no sanction or penalty). Likewise, here, the Utilities face no sanction or penalty for failure to comply with the requirements because the ordering paragraphs include no provision for sanctions or penalties. *Id.; cf. Mitz,* 278 S.W.3d at 26 (appellants showed hardship where they faced continuing threat of civil and criminal liability). As noted above, the Utilities argue that failure to meet the requirements *could* bar recovery in the future. Even assuming future recovery of some expenses is actually barred at some point, the inability to recover all expenses does not necessarily harm the Utilities. In fact, even after the questioned expenses were deducted because the Utilities were unable to present the required documentation, the Utilities' requested rates were not affected, and the Commission approved their requested rates. Nor is it certain that the Utilities will request the expenses at issue in future COSA filings; in these cases, they withdrew the questioned expenses and nonetheless received the requested rates. Thus, the Utilities are not faced with the dilemma of compliance or sanction, and they have failed to show the requisite hardship. *See Perry,* 66 S.W.3d at 250; *Atmos Energy,* 127 S.W.3d at 859–60.

**\*5** Because the Utilities have failed to establish a justiciable controversy, we sustain the Commission's first issue as to ripeness. We therefore do not reach the Commission's second issue as to the merits of the trial court's judgment. *See* Tex.R.App. P. 47.1 (appellate court opinions should be as "brief as practicable"), 47 .4 (memorandum opinions should be "no longer than necessary to advise the parties of the court's decision and the basic reasons for it").

### CONCLUSION

Having concluded that these cases are not fit for judicial decision and that denial of the requested relief will not constitute a hardship on the Utilities, we reverse the judgment and dismiss the Utilities' claims.

Tex.App.-Austin,2014.
Railroad Com'n of Texas v. CenterPoint Energy Resources Corp.
Not Reported in S.W.3d, 2014 WL 4058727 (Tex.App.-Austin)

Briefs and Other Related Documents (Back to top)

• 2014 WL 644359 (Appellate Brief) Brief of Appellee Centerpoint Energy Resources Corp., d/b/a Centerpoint Energy Entex and Enterpoint Energy Texas Gas (Feb. 10, 2014) Original Image of this Document with Appendix (PDF)
• 2014 WL 644360 (Appellate Brief) Brief of Appellee Texas Gas Service Company, a Division of Oneok, Inc. (Feb. 10, 2014) Original Image of this Document with Appendix (PDF)
• 2014 WL 644361 (Appellate Brief) Brief of Appellee Centerpoint Energy Resources Corp., d/b/a Centerpoint Energy Entex and Centerpoint Energy Texas Gas (Feb. 10, 2014) Original Image of this Document with Appendix (PDF)
• 2013 WL 6712920 (Appellate Brief) Amended Brief of Railroad Commission of Texas (Dec. 10, 2013) Original Image of this Document with Appendix (PDF)
• 2013 WL 6712921 (Appellate Brief)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 4058727 (Tex.App.-Austin)
**(Cite as: 2014 WL 4058727 (Tex.App.-Austin))**

Amended Brief of Railroad Commission of Texas (Dec. 10, 2013) Original Image of this Document with Appendix (PDF)
• 2013 WL 6712922 (Appellate Brief) Amended Brief of Railroad Commission of Texas (Dec. 10, 2013) Original Image of this Document with Appendix (PDF)

---

Judges and Attorneys(Back to top)

Judges | Attorneys

Judges

**• Field, Hon. Scott K.**
State of Texas Court of Appeals, 3rd District
Austin, Texas 78701
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

**• Goodwin, Hon. Melissa Young**
State of Texas Court of Appeals, 3rd District
Austin, Texas 78701
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

**• Puryear, Hon. David E.**
State of Texas Court of Appeals, 3rd District
Austin, Texas 78701
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

**• Yelenosky, Hon. Stephen Andrew**
State of Texas District Court, 345th District
Austin, Texas 78701
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

---

Attorneys

Attorneys for Appellant
**• Fraser, Douglas Burt**
Austin, Texas 78701
Litigation History Report | Profiler

Attorneys for Appellee
**• McKaughan, Dane**
Austin, Texas 78701
Litigation History Report | Profiler

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

Briefs and Other Related Documents

Oral Argument Transcripts with Streaming Media

Judges and Attorneys

Supreme Court of Texas.
TXU ELECTRIC COMPANY, et al., Appellants,
v.
PUBLIC UTILITY COMMISSION OF TEXAS, et al., Appellees.

No. 00–0936.
Argued Jan. 31, 2001.
Decided June 6, 2001.
Rehearing Overruled Aug. 30, 2001.

Incumbent electric utility and intervenors appealed decision by the Public Utility Commission (PUC) on financing for recovery of utility's regulatory assets and stranded costs during deregulation to competitive market. The 250th District Court, Travis County, reversed and remanded in part. Appeal was taken. The Supreme Court, Owen, J., held that: (1) the PUC could employ a second present value test to determine whether tangible and quantifiable benefits to ratepayers were provided by securitization through bonds secured by transition charges; (2) the PUC was required to assume that, absent securitization, regulatory assets and stranded costs would be recovered through competition transition charges in less than forty years; (3) it was not required to use the weighted average life of six years over which utility's transition bonds would be outstanding; (4) it lacked the discretion to consider utility's regulatory assets on an asset-by-asset basis; (5) it may apply the rate design methodology established in an utility's last rate design case to the data in that rate case, rather than to more current data; and (6) in an opinion by Hecht, J., the PUC was not required to reallocate overpayments or underpayments of transition charges by any one class among all customers.

Affirmed in part, reversed in part, and remanded.

Owen, J., dissented in part and filed opinion joined by Enoch and Baker, JJ.

**\*275** Opinion by Justice Owen

West Headnotes

**[1] Electricity 145 8**

145 Electricity
    145k2 Electric Companies
        145k8 k. Indebtedness, liens, and mortgages. Most Cited Cases
Public Utility Commission (PUC) could employ a second present value test to determine whether tangible and quantifiable benefits to ratepayers were provided by securitization through bonds secured by incumbent electric utility's transition charges to recover regulatory assets and stranded costs during deregulation to competitive market, but the PUC was required to assume that, absent securitization, regulatory assets and stranded costs would be recovered through competition transition charges in considerably less than forty years. V.T.C.A., Utilities Code §§ 39.201, 39.262, 39.301, 39.303(a).

**[2] Electricity 145 8**

145 Electricity
    145k2 Electric Companies
        145k8 k. Indebtedness, liens, and mortgages. Most Cited Cases
Public Utility Commission (PUC) was not required to use the weighted average life of six years over which incumbent electric utility's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

transition bonds would be outstanding for the recovery of regulatory assets and stranded costs during deregulation to competitive market; rather, to determine whether the amount securitized would exceed the present value of the revenue requirement over the life of the proposed transition bond associated with the regulatory assets or stranded costs sought to be securitized, the PUC could take into account the actual timing of bond payments until the last payment is made on the oldest bond after twelve years. V.T.C.A., Utilities Code § 39.301.

**[3] Electricity 145 ⚷8**

145 Electricity
    145k2 Electric Companies
        145k8 k. Indebtedness, liens, and mortgages. Most Cited Cases
   Public Utility Commission (PUC) lacked the discretion to consider incumbent electric utility's regulatory assets on an asset-by-asset basis in determining the amount to be securitized through transition bonds for the recovery of regulatory assets and stranded costs during deregulation to competitive market; rather, the PUC was required to consider regulatory assets in the aggregate to determine whether those assets met the requirements for securitization and could not categorically exclude certain types of regulatory assets from securitization. V.T.C.A., Utilities Code §§ 39.301, 39.303(a).

**[4] Electricity 145 ⚷11.5(1)**

145 Electricity
    145k11.5 Discrimination and Overcharge
        145k11.5(1) k. In general. Most Cited Cases
   (Formerly 145k11.3(1))
   Public Utility Commission (PUC) may apply the rate design methodology established in an incumbent electric utility's last rate design case to the data in that rate case, rather than to more current data, in order to establish demand

allocation factors that determine how transition charges are to be allocated among classes of customers in connection with deregulation to competitive market. V.T.C.A., Utilities Code §§ 39.253(c-h).

**[5] Electricity 145 ⚷8**

145 Electricity
    145k2 Electric Companies
        145k8 k. Indebtedness, liens, and mortgages. Most Cited Cases
   Finding and conclusion by Public Utility Commission (PUC) on adjustment for loss on reacquired debt in future proceeding involving electric utility were advisory and premature.

**[6] Electricity 145 ⚷11.5(1)**

145 Electricity
    145k11.5 Discrimination and Overcharge
        145k11.5(1) k. In general. Most Cited Cases
   Public Utility Commission (PUC) was not required to reallocate overpayments or underpayments of transition charges by any one class among all customers of incumbent electric utility and thereby fully cross-collateralize responsibility for the transition to a competitive market; rather, it could engage in a non-standard true-up of reallocating transition charges among classes. V.T.C.A., Utilities Code §§ 39.253, 39.307.

**\*276** Roy Q. Minton, Minton Burton Foster & Collins, Robert J. Hearon, Jr., Mary A. Keeney, Graves Dougherty Hearon & Moody, Austin, Robert A. Wooldridge, Robert M. Fillmore, Howard V. Fisher, Worsham Forsythe Wooldridge, Dallas, for Appellant.

**\*277** Thomas K. Anson, Sheinfeld Maley & Kay, Geoffrey M. Gay, Lloyd Gosselink Blevins Rochelle, Austin, Alan W. Harris, Dallas, Marianne Carroll, David B. Gross, Carroll & Gross, Andrew Kever, Bickerstaff Heath Smi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

ley Pollan Kever & McDaniel, Mark C. Davis, Brickfield Burchette & Ritts, James K. Rourke , Thomas Lane Brocato, Suzi Ray McClellan, Office of Public Utility Counsel, Steven Baron , Office of Attorney General of Texas, John Cornyn, Attorney General of the State of Texas, Jeffrey S. Boyd, Karen Watson Kornell, Douglas Fraser, Bryan L. Baker, Office of the Attorney General, Jonathan Day, Lino Mendiola, Mayor Day Caldwell & Keeton, Diane Barlow–Sparkman, Mark W. Smith, J. Kay Trostle, Elizabeth H. Drews, James G. Boyle, Law Office of Jim Boyle, Austin, for Appellee.

PER CURIAM.

In 1999, the Legislature amended the Public Utility Regulatory Act (PURA) to usher in deregulation of retail electric utility rates in Texas. FN1 As part of that plan, the Legislature concluded that, subject to certain restrictions, an existing utility like TXU Electric Company may recover amounts that the PURA defines as "regulatory assets" by using securitization financing. Securitization is accomplished through a financing order issued by the Commission that authorizes a utility to issue transition bonds. The transition bonds are repaid or secured by transition charges to ratepayers in a utility's service area. TXU requested the Commission to issue a financing order securitizing certain of its regulatory assets. The Commission authorized securitization of some but not all of those assets. A district court reversed the Commission's order in part and remanded the case for further proceedings. TXU and others bring this direct appeal to our Court. FN2

> FN1. Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543.
>
> FN2. TEX. UTIL.CODE § 39.303(f) (providing that review of financing orders under the PURA are to be directly

appealed from the district court to this Court).

We hold that: 1) in order to ensure that securitization provides tangible and quantifiable benefits to ratepayers greater than would have been achieved absent the issuance of transition bonds, FN3 the Commission may apply a present value test in addition to the present value and revenue requirement tests expressly set forth in sections 39.301 and 39.303(a) of the PURA; 2) in applying an additional present value test, the Commission should assume that recovery of regulatory assets and stranded costs absent securitization would occur in substantially less than forty years; 3) the Commission must consider regulatory assets that a utility seeks to securitize in the aggregate to determine whether those assets meet the requirements for securitization and cannot categorically exclude certain types of regulatory assets from securitization; 4) section 39.253 permits the Commission to apply the rate design methodology established in a utility's last rate design case to the data in that rate case rather than to more current data, in order to establish demand allocation factors that determine how transition charges are to be allocated among classes of customers; 5) the Commission is authorized by section 39.307 to adopt a non-standard true-up provision that reallocates transition charges among classes of customers in a manner that differs from the allocation procedures set forth in section 39.253; 6) none of the other issues regarding allocation of transition costs among classes of customers has **\*278** merit; and 7) certain findings of fact and conclusions of law by the Commission are advisory. Accordingly, we affirm the judgment of the district court in part, reverse it in part, and remand this case to the Commission for further proceedings. Justice Owen's concurring opinion is the opinion of the Court with respect to the issues that it addresses, and Justice Hecht's concurring opinion is the opinion of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

the Court with respect to the issues that it addresses.

> FN3. All statutory references are to the Texas Utilities Code, unless otherwise indicated.

Justice OWEN filed a concurring opinion, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON joined.

Justice HECHT filed a concurring opinion, in which Chief Justice PHILLIPS, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON joined.

Justice OWEN filed a dissenting opinion, in which Justice ENOCH and Justice BAKER joined.

Justice O'NEILL did not participate in the decision.

Justice OWEN, joined by Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON, concurring.

In 1999, the Legislature determined that partial deregulation of the electric power industry was in the public interest. To that end, the Legislature amended the Public Utility Regulatory Act (PURA).FN1 In *City of Corpus Christi v. Public Utility Commission,*FN2 also decided today, we describe in some detail the sections of the PURA that permit an electric utility to securitize regulatory assets and stranded costs as part of the transition to market-based retail electric rates. We need not repeat that discussion here.

> FN1. Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543.

> FN2. 51 S.W.3d 231 (Tex.2001).

TXU Electric Company filed an application with the Public Utility Commission for a financing order in which TXU sought to securitize $1.65 billion in regulatory assets and other costs and proposed to write off about $285 million in regulatory assets. The Commission allowed TXU to securitize $363 million of regulatory assets. TXU and several of the forty-four parties who had intervened in the proceedings before the Commission appealed to district court in Travis County. The district court held that: 1) the Commission did not err in applying a present value test in addition to the present value and revenue requirement tests set forth in sections 39.301 and 39.303(a) of the PURA; 2) the Commission had the discretion to consider TXU's regulatory assets on an asset-by-asset basis in determining whether securitization would provide tangible benefits to ratepayers; 3) the Commission should have examined how long it would take TXU to recover the regulatory assets at issue under the regulatory scheme established by the 1999 amendments to the PURA rather than under the previously existing regulatory scheme; 4) the Commission was not required to use the average life of the transition bonds that would be issued under the financing order in calculating the maximum amount that TXU could securitize; 5) the Commission's Finding of Fact 113 and references to that finding in Conclusion of Law 41 and Ordering Paragraph 37, regarding future treatment of reacquired debt securitized under the financing order, are advisory and have no *res judicata* effect; and 6) the Commission did not **\*279** err in its treatment of certain rate design, allocation, and true-up issues.

TXU, the Commission, the State of Texas, the Office of Public Utility Counsel, Texas Industrial Energy Consumers, Texas Retailers Association, the Steering Committee of Cities Served by TXU, the Coalition of Independent Colleges and Universities, and Nucor Steel, a division of Nucor Corporation, appealed dir-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

ectly to this Court pursuant to section 39.303(f) of the PURA.

## I

[1] One of the principal issues in this appeal is how to determine the amount of regulatory assets that a utility may securitize under the PURA. Section 39.303(a) says that when a utility applies to recover its regulatory assets and eligible stranded costs, the Commission shall adopt a financing order upon finding that "the total amount of revenues to be collected under the financing order is less than the revenue requirement that would be recovered over the remaining life of the stranded costs using conventional financing methods and that the financing order is consistent with the standards in Section 39.301." FN3 The parties disagree about what constitute "the standards in Section 39.301." Specifically, the parties diverge on how the Commission is to carry out section 39.301's directive that it "shall ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds." FN4

> FN3. TEX. UTIL.CODE § 39.303(a).

> FN4. *Id.* § 39.301.

## A

Section 39.301 and the relevant parts of section 39.303 provide:

### § 39.301 Purpose

The purpose of this subchapter is to enable utilities to use securitization financing to recover regulatory assets and stranded costs, because this type of debt will lower the carrying costs of the assets relative to the costs that would be incurred using conventional utility financing methods. The proceeds of the transition bonds shall be used solely for the purposes of reducing the amount of re-

coverable regulatory assets and stranded costs, as determined by the commission in accordance with this chapter, through the refinancing or retirement of utility debt or equity. The commission shall ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds. The commission shall ensure that the structuring and pricing of the transition bonds result in the lowest transition bond charges consistent with market conditions and the terms of the financing order. The amount securitized may not exceed the present value of the revenue requirement over the life of the proposed transition bond associated with the regulatory assets or stranded costs sought to be securitized. The present value calculation shall use a discount rate equal to the proposed interest rate on the transition bonds. FN5

> FN5. *Id.*

### § 39.303. Financing Orders; Terms

(a) The commission shall adopt a financing order, on application of a utility to recover the utility's regulatory assets and eligible stranded costs under Section 39.201 or 39.262, on making a finding that the total amount of revenues to be collected under the financing order is **\*280** less than the revenue requirement that would be recovered over the remaining life of the stranded costs using conventional financing methods and that the financing order is consistent with the standards in Section 39.301.

(b) The financing order shall detail the amount of regulatory assets and stranded costs to be recovered and the period over which the nonbypassable transition charges shall be recovered, which period may not exceed 15 years.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

* * *

(e) The commission shall issue a financing order under Subsections (a) and (g) not later than 90 days after the utility files its request for the financing order.<sup>FN6</sup>

FN6. *Id.* § 39.303(a), (b), (e).

All parties agree that there are at least two limitations on the maximum amount of regulatory assets or stranded costs that can be securitized. One limitation is found in the last two sentences of section 39.301. They require a present value test. The present value test expressly set forth in section 39.301 examines the revenue requirement over the life of the bonds, which under the PURA cannot exceed fifteen years.<sup>FN7</sup>

FN7. *Id.* § 39.302(6).

Another limitation on the amount that may be securitized is the revenue requirement test required by section 39.303(a). All parties agree that under that provision, the total revenues to be collected under the financing order, including the costs of issuing and servicing the bonds, must be less than the revenue requirement using conventional financing methods over the remaining life of the assets, which in this case is presently up to forty years. There is no present value test component in determining whether the total revenue requirement is met. The revenue requirement in total dollars over the life of the bonds is compared with the revenue requirement in total dollars over the remaining life of the regulatory assets.

The Commission and other parties to this appeal have taken the position that there is a third limitation on the amount that may be securitized. They contend that in order for the Commission to discharge its obligation to "ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the is-

suance of transition bonds," the Commission is required to ascertain the present value of the revenue requirements of the regulatory assets without securitization, using the actual scheduled life of the assets under the regulatory scheme as it existed before the 1999 amendments to the PURA. The Commission maintains that it is then required to compare the outcome of that analysis with the present value computation specified in the final two sentences of section 39.301 to see if securitization results in a greater benefit to ratepayers.

The revenue requirement over the forty-year remaining life of the assets that TXU seeks to securitize was about $2.467 billion. Using the interest rates that TXU expected would apply to the transition bonds, the revenue requirement of the bonds was about $124 million less than $2.467 billion. Using TXU's "worst case" scenario for interest rates, the revenue requirement of the bonds was about $100,000 less than the $2.467 billion. TXU thus meets the revenue requirement test. However, the Commission argues that when the present value of transition charges collected over the twelve-year life of the transition bonds is compared with the present value of payment for the regulatory assets over their **\*281** forty-year life through utility rates, it can be seen that securitization will harm, not benefit, ratepayers. The Commission's financing order in this case reflects that if a remaining life of up to forty years for the regulatory assets is used in a present value analysis, the increased cost to ratepayers could be $204 million. Some of the intervenors assert that increased costs could be as much as $500 million, using a forty-year life without taking into account other benefits that there might be to ratepayers.

TXU takes the position that the Commission is not authorized to engraft onto the PURA's securitization provisions a present value test that is different from or in addition

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

to the present value test expressly set forth in section 39.301. TXU contends that the only computations that the Legislature intended to be performed in determining the amount to be securitized are the two computations to be performed under sections 39.301 and 39.303(a), which are the present value calculation required by the last two sentences of section 39.301 and the total revenue test under section 39.303(a). TXU contends that the requirement that ratepayers receive a tangible and quantifiable benefit from securitization is measured by these tests and other considerations. TXU says that there are quantifiable benefits to ratepayers from securitizing the $1.65 billion of regulatory assets because to meet the total revenue test in section 39.303(a) and the present value test set forth in the last two sentences of section 39.301, TXU would write off and never recover from ratepayers approximately $285 million in regulatory assets.

The district court adopted somewhat of a middle ground. It concluded that the Commission had the discretion to apply a second present value test to determine whether securitization provides "tangible and quantifiable benefits" within the meaning of section 39.301. But the district court differed with the Commission about how the second present value test should be calculated. The district court concluded that the phrase "absent the issuance of transition bonds" in section 39.301 required the Commission to base its second present value calculation "on the asset recovery period that exists under the new regulatory scheme" of the PURA. More specifically, the district court held that the Commission's second present value test could not "lawfully be based upon the recovery periods under the earlier system of rate regulation that provided for asset lives up to 40 years."

For the reasons considered below, we conclude that the district court's construction of

sections 39.301 and 39.303(a) best comports with the express provisions of the PURA. We agree with the district court that the Commission is authorized to impose a second present value test in determining the amount of regulatory assets or stranded costs that can be securitized, but in determining present value "absent the issuance of transition bonds," the Commission should use a remaining life for the assets that is far less than forty years. The PURA contemplates that the transition to "a fully competitive electric power industry"[FN8] will span considerably less than forty years.

FN8. *Id.* § 39.001(a).

**B**

We begin our analysis with the text of section 39.301. As indicated above, the sentence that gives rise to the controversy says, "The commission shall ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance**\*282** of transition bonds."[FN9] The first question that must be answered in order to satisfy this statutory requirement is what would happen to the regulatory assets at issue if they were not securitized.

FN9. *Id.* § 39.301.

The PURA provides that if a utility does not securitize all or some of its regulatory assets and stranded costs, they can be recovered through nonbypassable "competition transition charge[s]."[FN10] Section 39.201(k) gives the Commission discretion to determine the length of time over which regulatory assets and stranded costs may be recovered by this method.[FN11] All parties, including the Commission, agree that the Commission could shorten the remaining life over which regulatory assets and stranded costs will be recovered to a time period far less than the remaining life of up to forty years that those assets and costs would have had absent the 1999 amendments to the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

PURA. The determination of the appropriate recovery period would occur in a rate proceeding that is separate from securitization.

> FN10. *Id.* § 39.201.

> FN11. *Id.* § 39.201(k).

A large part of the regulatory assets that TXU seeks to securitize are Statement of Financial Accounting Standard (SFAS) 109 assets. SFAS 109 assets essentially represent amounts that TXU would have recovered under the former regulatory scheme from ratepayers over a period of forty years to pay federal income taxes that it will owe in connection with expenditures it made in the past that were capitalized instead of expensed. The Commission asks this Court to authorize a present value test for these assets based on a remaining life of forty years even though the Commission knows that in all probability, under section 39.201(k), it will shorten the remaining life to something far less than forty years. Notwithstanding the Commission's recognition of this fact, it maintains that the district court erred in requiring it to use a remaining life of less than forty years because amount of any reduction to the forty-year recovery period has yet to be determined. The Office of Public Utility Counsel similary argues says that "the essential problem with the lower court's position is that neither TXU, the District Court, or anyone else can state with any level of precision over what period the non-securitized assets will be recovered."

Although there may be some uncertainty as to precisely how much the Commission would shorten the recovery period for the regulatory assets at issue if they were not securitized, that uncertainty does not justify the use of a forty-year life. The PURA contemplates a far shorter recovery period for regulatory assets and other stranded costs that are not securitized but are instead recovered through competition trans-ition charges. Each electric utility was required to file by April 1, 2000 proposed tariffs that included any expected competition transition charges. All or any part of a utility's regulatory assets that are not securitized can be recovered through competition transition charges. FN12 Section 39.201(k) sets forth the factors that the Commission is to consider in determining the length of time over which stranded costs, including regulatory assets, will be recovered. FN13 The PURA indicates that a **\*283** considerable portion of these costs are to have been recovered within the two-year period after customer choice begins on January 1, 2002. FN14 Section 39.201(*l* ) provides for a true-up proceeding in January 2004 in which adjustments may be made to recover "any remaining stranded costs." FN15 The Commission may extend the collection period for competition transition charges, if necessary. FN16 This indicates that the recovery period for the competition transition charge initially set by the Commission will be a relatively short period of time, and that any extension will likewise be a relatively short period of time. Section 39.262 contemplates that if, during the 2004 true-up proceeding, there are stranded costs in addition to those previously estimated, those remaining costs can be added to the amounts to be recovered by competition transition charges, or at the utility's option, securitized through bonds that cannot have a life longer than fifteen years. FN17 The fact that a utility may securitize remaining stranded costs and regulatory assets, but over a period of time not to exceed fifteen years, FN18 indicates that the Legislature had something considerably less than forty years in mind for the transition to "a fully competitive electric power industry." FN19

> FN12. *See id.* § 39.201(i).

> FN13. Section 39.201(k) provides:

>> (k) In determining the length of time over which stranded costs under Sub-

Page 9

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

section (h) may be recovered, the commission shall consider:

(1) the electric utility's rates as of the end of the freeze period;

(2) the sum of the transmission and distribution charges and the system benefit fund fees;

(3) the proportion of estimated stranded costs to the invested capital of the electric utility; and

(4) any other factor consistent with the public interest as expressed in this chapter.

*Id.* § 39.201(k).

FN14. Section 39.102(a) provides that customer choice begins, with certain exceptions not material here, on January 1, 2002. *Id.* § 39.102(a).

FN15. Section 39.201(*l*) says:

Two years after customer choice is introduced, the stranded cost estimate under this section shall be reviewed and, if necessary, adjusted to reflect a final, actual valuation in the true-up proceeding under Section 39.262. If, based on that proceeding, the competition transition charge is not sufficient, the commission may extend the collection period for the charge or, if necessary, increase the charge. Alternatively, if it is found in the true-up proceeding that the competition transition charge is larger than is needed to recover any remaining stranded costs, the commission may:....

*Id.* § 39.201(*l*).

FN16. *Id.*

FN17. Section 39.262(c) provides:

(c) After January 10, 2004, at a schedule and under procedures to be determined by the commission, each transmission and distribution utility, its affiliated retail electric provider, and its affiliated power generation company shall jointly file to finalize stranded costs under Subsections (h) and (i) and reconcile those costs with the estimated stranded costs used to develop the competition transition charge in the proceeding held under Section 39.201. Any resulting difference shall be applied to the nonbypassable delivery rates of the transmission and distribution utility, except that at the utility's option, any or all of the remaining stranded costs may be securitized under Subchapter G.

*Id.* § 39.262(c). The recovery period for transition charges under the PURA's securitization scheme is limited to fifteen years by section 39.303(b), and the life of transition bonds is similarly limited to fifteen years by section 39.302(6). *Id.* §§ 39.303(b), 39.302(6).

FN18. *Id.* § 39.303(b).

FN19. *Id.* § 39.001(a).

Statements made by PUC Commissioners at an open meeting in this case are consistent with our understanding of the Legislature's intent. Those Commissioners indicated that competition transition charges, which would be the method for recovering regulatory assets and stranded costs absent securitization, would be collected over a period of time that would be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

unlikely to exceed fifteen years and that **\*284** could be as few as eight years. Those statements are not binding, but they indicate that the Commission understands that the Legislature did not intend for the transition to a fully competitive market to be protracted.

We therefore conclude that the district court did not err in holding that the Commission could employ a present value test in addition to the present value test expressly set forth in section 39 .301, but that the Commission must assume that absent securitization, regulatory assets and stranded costs would be recovered through competition transition charges in considerably less than forty years.

## II

[2] The financing order in this case approved the issuance of a series of transition bonds with differing maturity dates TXU explains that this was designed to allow its regulatory assets to be securitized at the lowest overall interest rate on the best possible terms, and no one takes issue with that assertion. The bonds' maturity dates range from one to twelve years after their issuance. TXU contends that in performing the present value test set forth in the last two sentences of section 39.301,[FN20] the Commission should have used the weighted average life over which the bonds will be outstanding, which would be approximately six years, rather than twelve years. We approve of the Commission's methodology.

FN20. The last two sentences of section 39.301 provide:

The amount securitized may not exceed the present value of the revenue requirement over the life of the proposed transition bond associated with the regulatory assets or stranded costs sought to be securitized. The present value calculation shall use a discount rate equal to the proposed interest rate

on the transition bonds.

*Id.* § 39.301.

The Commission's method of calculating present value takes into account the actual timing of bond payments until the last payment is made on the oldest bond. The Commission concluded, and we agree, that accounting for the actual timing of payments is necessary to determine present value. TXU's averaging method does not mathematically account for transition charges that will be collected until the last of the series of transition bonds matures twelve years from the date of issuance.

## III

[3] Another significant issue presented is whether, in determining the amount to be securitized, the Commission must consider the regulatory assets or other stranded costs to be securitized in the aggregate or, instead, may conduct an asset-by-asset analysis. We conclude that the Commission must consider regulatory assets in the aggregate for the same reasons expressed in *Corpus Christi.*[FN21]

FN21. 51 S.W.3d at 231 – 255.

Briefly, what is at issue in this case are regulatory assets that do not currently earn a return. The majority of TXU's regulatory assets fall into this category. Among TXU's regulatory assets that earn no return are approximately $1.45 billion in SFAS 109 assets. As explained above, these assets essentially represent amounts that TXU would have recovered under the former regulatory scheme from ratepayers to pay federal income taxes that it will owe, when it recovers through rates, expenditures it made in the past that were capitalized instead of expensed.

Some of TXU's regulatory assets do earn a return, as much as 13.637 percent. The proposed interest rate on TXU's transition bonds

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

was 7.24 percent. Accordingly,**\*285** there was considerable room to aggregate some of TXU's regulatory assets that earned no return with regulatory assets that earn a relatively high rate of return and still have a net benefit to ratepayers from securitization.

The State of Texas, the Office of Public Utility Counsel, and Texas Industrial Energy Consumers have taken the position that to maximize the benefit of securitization to ratepayers, all regulatory assets that do not earn a rate of return should be declared ineligible for securitization. The State and those aligned with it on these issues contend that each regulatory asset must be analyzed on a stand-alone basis to determine if securitization of that asset benefits ratepayers. As we explain in *Corpus Christi,* the PURA does not support that position.<sup>FN22</sup> The PURA says that all regulatory assets are to be securitized on application of a utility, subject to the requirement that "the total amount of revenues to be collected under the financing order" meets certain requirements.<sup>FN23</sup> The PURA defines "regulatory asset" with specificity.<sup>FN24</sup> Regulatory assets are defined with reference to a utility's 1998 Securities and Exchange Commission Form 10–K, which lists regulatory assets. A utility is entitled to securitize 100 percent of its regulatory assets,<sup>FN25</sup> subject only to the tests in sections 39.303(a) and 39 .301.<sup>FN26</sup> The present value test in section 39.301 ensures that a utility will not recover a return on these assets higher than the return it would receive under the existing regulatory scheme. Neither the present value test nor the requirement in section 39.301 that the Commission "ensure that securitization provides tangible and quantifiable benefits to ratepayers, greater than would have been achieved absent the issuance of transition bonds"<sup>FN27</sup> authorizes the Commission to "maximize" benefits to ratepayers by refusing to securitize certain types of regulatory assets when 100 percent of regulatory assets are "qualified costs" under the PURA.<sup>FN28</sup>

FN22. *Id.*

FN23. TEX. UTIL.CODE § 39.303(a).

FN24. *Id.* § 39.302(5).

FN25. *Id.* §§ 39.302(4), 39.201(i)(1).

FN26. *Id.* §§ 39.303(a), 39.301.

FN27. *Id.* § 39.301.

FN28. *Id.* § 39.302(4).

The district court erred in concluding that the Commission has the discretion to consider regulatory assets on an asset-by-asset basis. Because the Commission did not consider the regulatory assets and other costs that TXU sought to securitize in the aggregate, the Commission must do so on remand.

### IV

[4] A number of parties have challenged the manner in which the Commission allocated transition charges among customer classes. TXU proposed and the Commission adopted seven regulatory asset recovery classes for purposes of collecting transition charges. Those classes and the regulatory asset allocation factors assigned to each under section 39.253 are:

| Class: | Allocation Factor: |
| --- | --- |
| Residential | 41.2705% |
| General Service—Secondary | 44.7323% |

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

| | |
|---|---|
| General Service—Primary | 5.8982% |
| High Voltage Service | 2.7875% |
| Lighting Service | 0.6836% |
| Instantaneous Interruptible | 1.8568% |
| Noticed Interruptible | 2.7711% |
| *Total* | 100.0000% |

Nucor Steel is in the Instantaneous Interruptible regulatory asset recovery class. Nucor Steel is a nonfirm, also known as an interruptible, customer on TXU's system. A utility may interrupt service to an interruptible customer for specified reasons, typically during periods of high demand from other customers on that utility's system. Texas Industrial Energy Consumers **\*286** (TIEC) is a voluntary association of companies that operates industrial facilities in TXU's service area. Nucor Steel and TIEC take issue with how the Commission determined the percentage of transition costs each customer class would bear. Nucor Steel and TIEC assert that the Commission should have used the more current, 1999 data rather than the data used in TXU's most recent rate-design case, which was 1997 data.

The pertinent section of the PURA is 39.253(c)-(h).[FN29] As we explain in greater detail in *Corpus Christi,*[FN30] the allocation of stranded costs under section 39.253 has two basic components. One is determined by applying the same "methodology used to allocate the costs of the underlying assets in the electric utility's most recent commission order addressing rate design."[FN31] The other is the energy consumption of the respective classes[FN32] "based on the relevant class characteristics as of May 1, 1999, adjusted for normal weather conditions."[FN33] The question presented here is whether the Commission should apply the same methodology used in TXU's last rate design case to the data used in that rate case, or whether the Commission is free to choose more recent data.[FN34]

FN29. *Id.* § 39.253(c)-(h).

FN30. 51 S.W.3d at 257.

FN31. Tex. Util.Code § 39.253(c)-(e).

FN32. *Id.* § 39.253(c).

FN33. *Id.* § 39.253(g).

FN34. *Cf. Corpus Christi,* 51 S.W.3d at 259.

We conclude in *Corpus Christi* and in this case that the PURA is unclear in this regard.[FN35] In such a situation, we give some deference to the Commission as long as its interpretation of a code provision is a reasonable one and does not conflict with the code's language.[FN36] The Commission construed section 39.253 to mean that the methodology used in a utility's last rate design case is to be applied to the data used in that rate case. That is a reasonable construction of the PURA that does not contradict any of its language, and we agree with the Commission's construction.

FN35. *Id.*

FN36. *See Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944) (observing that courts will ordinarily adopt and uphold a construction placed upon a statute by a department charged with its administration if the statute is ambiguous or uncertain, and the construction is reasonable); *Texas Ass'n of Long Distance Tel. Cos. v. Pub. Util. Comm'n,* 798 S.W.2d 875, 884

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

(Tex.App.—Austin 1990, writ denied) (observing that construction of a statute by an administrative agency charged with its enforcement is entitled to great weight, particularly if the statute is ambiguous, so long as the agency's construction is reasonable and does not contradict the plain language of the statute); TEX. GOV'T CODE § 311.023(6) (providing that in construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider the administrative construction of the statute).

## V

Several parties who are also parties in *Corpus Christi* raise many of the same issues in both cases.FN37 Our decision in CP & L resolves each of these issues, and we will not lengthen this opinion by reiterating all the reasons for our holdings. We instead briefly summarize each issue and our disposition.

> FN37. Those parties include the Office of Public Utility Counsel, Texas Industrial Consumers, and Nucor Steel, who filed an amicus brief with this Court in *Corpus Christi.*

Certain of TXU's customers assert that the Commission failed to follow section 39.253 in allocating transition costs to the **\*287** non-firm industrial customer classes. They contend that the Commission erred in applying the 150 percent demand allocator required by section 39.253(d) FN38 to all the transition costs rather than first subtracting the transition costs allocated to residential customers. We hold in this case, as we do in *Corpus Christi,* that section 39.253 is ambiguous in this regard and that the Commission's construction is a reasonable one and should be accorded deference.

> FN38. TEX. UTIL.CODE § 39.253(d) (requiring that "[n]on-firm industrial

customers shall be allocated stranded costs equal to 150 percent of the amount allocated to that class").

TIEC says that in determining how much of the transition costs should be allocated to the industrial classes, the Commission should have excluded load lost when customers switched to sources of power that exempt them from paying transition charges.FN39 Again, for the reasons we consider in *Corpus Christi,* we reject that argument.FN40

> FN39. *See id.* § 39.262(k).

> FN40. 51 S.W.3d at 259 – 261.

## VI

[5] Several parties to this appeal, including the Commission, contend that the district court erred when it held that the Commission's Finding of Fact 113 and references to that finding in Conclusion of Law 41 and Ordering Paragraph 37 were "advisory and superfluous to the Order and therefore [have] no *res judicata* effect." The finding of the Commission that is at issue concerned loss on reacquired debt.

TXU reacquired preferred stock and high-cost debt before the maturity date of that debt by paying a premium. The loss TXU sustained in those transactions is included in the definition of regulatory assets under the PURA, and the Commission allowed TXU to include loss on reacquired debt as part of the amount securitized in the financing order. This same loss on reacquired debt is also reflected as an increase in TXU's cost of capital, and that in turn increases TXU's rate of return. The Commission and others were concerned that TXU would enjoy a double recovery of its losses. Responding to that concern, the Commission concluded that loss on reacquired debt "should not be removed from [TXU's] cost-of-capital calculation for purposes of the annual report submitted pursuant to PURA § 39.257," but that in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

stead an adjustment should be made in future proceedings.[FN41] In the Financing Order, Finding of Fact 113, the Commission said that:

> FN41. Tex. Pub. Util. Comm'n, *Application of TXU Electric Company for Financing Order to Securitize Regulatory Assets and Other Qualified Costs,* Docket No. 21527 (May 2, 2000).

[A]n adjustment should be made in the true up proceeding under PURA § 39.262 to account for the effect of securitizing the loss on reacquired debt on [TXU's] cost of capital. This treatment is necessary to comply with the Legislature's mandate in PURA § 39.262(a) that a utility and its affiliates "may not be permitted to overrecover stranded costs" by using any of the methods provided in Chapter 39 [§ 39.262(a) ]. In addition, any determinations regarding the effect of securitizing loss on reacquired debt on the calculation of stranded costs should not be made in this docket but should be made in [TXU's] cost unbundling case under PURA § 39.201.[FN42]

> FN42. *Id.* (footnote omitted).

We agree with the district court that this was an advisory and premature finding.**\*288** Whether an adjustment is required in a true-up or other future proceeding should await resolution in that proceeding.

\* \* \* \* \*

For the reasons considered above, we conclude that: 1) in order to ensure that securitization provides tangible and quantifiable benefits to ratepayers greater than would have been achieved absent the issuance of transition bonds, the Commission may apply a present value test in addition to the present value and revenue requirement tests expressly set forth in sections 39.301 and 39.303(a) of the PURA; 2) in applying an additional present value test, the Commission should assume that recovery of regulatory assets and stranded costs absent securitization would occur in substantially less than forty years; 3) the Commission must consider regulatory assets that a utility seeks to securitize in the aggregate to determine whether those assets meet the requirements for securitization and cannot categorically exclude certain types of regulatory assets from securitization; 4) section 39.253 permits the Commission to apply the rate design methodology established in a utility's last rate design case to the data in that rate case rather than to more current data, in order to establish demand allocation factors that determine how transition charges are to be allocated among classes of customers; 5) none of the other issues regarding allocation of transition costs among classes of customers has merit; and 6) certain findings of fact and conclusions of law by the Commission are advisory.

Justice HECHT, joined by Chief Justice PHILLIPS, Justice ABBOTT, Justice HANKINSON, and Justice JEFFERSON, concurring.

We join fully in the Court's judgment and in JUSTICE OWEN's concurring opinion. This is the opinion of the Court regarding the validity of the "non-standard true-up" included in the Public Utility Commission's financing order for TXU Electric Company.

[6] The financing order for TXU contains a non-standard true-up procedure essentially identical to the one in the financing order for Central Power and Light Company, which we approve today in *City of Corpus Christi v. Public Utility Commission,* 51 S.W.3d 231 (Tex.2001). A Commission witness testified that if any TXU customer class experienced a decrease in power usage of more than six to nine percent, that class would be "at risk for a cascading loss scenario." The arguments for and against that procedure in this case are the same as those made in *Corpus Christi* with one exception. Nucor Steel, one of TXU's largest

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

customers, argues that any overpayments or underpayments of transition charges by any one class should be reallocated among all TXU's customers, thereby fully cross-collateralizing responsibility for the transition as TXU proposed to the Commission. Without deciding whether the Commission was empowered to depart this far from the allocation requirements of section 39.253, we easily conclude that the Commission was not required to adopt this approach instead of the somewhat more restricted non-standard true-up. For the same reasons explained in our concurring opinion in that case, we approve of the non-standard true-up procedure in this case.

Justice OWEN, joined by Justice ENOCH and Justice BAKER, dissenting.

The financing order for TXU contains a non-standard true-up provision that is virtually identical to the non-standard true-up provision at issue in **\*289**_City of Corpus Christi v. Public Utility Commission,_FN1 which the Court also decides today. For the reasons set forth in my dissent in that case, I also dissent from the Court's approval of the non-standard true-up procedure in TXU's financing order.

FN1. 51 S.W.3d 231 (Tex.2001).

Tex.,2001.
TXU Elec. Co. v. Public Utility Com'n of Texas
51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126

Briefs and Other Related Documents (Back to top)

• 00-0936 (Docket) (Sep. 11, 2000)

Oral Argument Transcripts with Streaming Media (Back to top)

• 2001 WL 36161699 (Oral Argument) Oral Argument (Jan. 31, 2001)

Judges and Attorneys(Back to top)

Judges | Attorneys

Judges

• **Abbott, Hon. Michael**
State of Texas Municipal Court, City of Vidor
Vidor, Texas 77662
Litigation History Report | Judicial Reversal Report | Profiler

• **Enoch, Craig T.**

Litigation History Report | Judicial Reversal Report | Profiler

• **Hankinson, Hon. Deborah G.**

Litigation History Report | Judicial Reversal Report | Profiler

• **Hecht, Hon. Nathan L.**
State of Texas Supreme Court
Austin, Texas 78701
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

• **Jefferson, Hon. Wallace B.**

Litigation History Report | Judicial Reversal Report | Profiler

• **O'Neill, Hon. Alice**
State of Texas Municipal Court, City of Houston
Houston, Texas 77002-1553
Litigation History Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

• **Owen, Hon. Priscilla Richman**
United States Court of Appeals, Fifth Circuit
New Orleans, Louisiana 70130-3408
Litigation History Report | Judicial Reversal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

Report | Judicial Expert Challenge Report | Profiler

---

Attorneys

Attorneys for Appellant
• **Fillmore, Hon. Robert M.**
Unknown State
Litigation History Report | Profiler

• **Hearon, Robert J. Jr.**
Austin, Texas 78701
Litigation History Report | Profiler

• **Keeney, Mary A.**
Austin, Texas 78701
Litigation History Report | Profiler

• **Minton, Roy Q.**
Austin, Texas 78701-2198
Litigation History Report | Profiler

Attorneys for Appellee
• **Anson, Thomas K.**
Austin, Texas 78701
Litigation History Report | Profiler

• **Baker, Bryan Lawrence**
Austin, Texas 78701
Litigation History Report | Profiler

• **Baron, Steven**
Austin, Texas 78763
Litigation History Report | Profiler

• **Boyd, Hon. Jeffrey S.**
Unknown State
Litigation History Report | Profiler

• **Brocato, Thomas L.**
Austin, Texas 78701
Litigation History Report | Profiler

• **Carroll, Marianne**
Austin, Texas 78701-4093
Litigation History Report | Profiler

• **Cornyn, John**
Washington, District of Columbia 20510
Litigation History Report | Profiler

• **Davis, Mark C.**
Austin, Texas 78701-2415
Litigation History Report | Profiler

• **Day, Jonathan**
Houston, Texas 77002
Litigation History Report | Profiler

• **Drews, Elizabeth H.**
Austin, Texas 78701-4093
Litigation History Report | Profiler

• **Gay, Geoffrey M.**
Austin, Texas 78701
Litigation History Report | Profiler

• **Gross, David B.**
Ridgeland, Mississippi 39157-8766
Litigation History Report | Profiler

• **Kever, Andrew**
Austin, Texas 78701
Litigation History Report | Profiler

• **Mendiola, Lino III**
Austin, Texas 78701
Litigation History Report | Profiler

• **Rourke, James K. Jr.**
Austin, Texas
Litigation History Report | Profiler

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 S.W.3d 275, Util. L. Rep. P 26,789, 44 Tex. Sup. Ct. J. 854, 44 Tex. Sup. Ct. J. 1126
**(Cite as: 51 S.W.3d 275)**

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.